Steffen, C. J.,
with whom Shearing, J., joins,
dissenting:
In order to remedy a sub rosa desire to temporize the lawful sentence imposed on Buffalo, the majority has crafted an opinion that defies justification under an objective view of the law and the facts. I am therefore forced to dissent.[1]
Article 6, § 4, of the Nevada Constitution limits this court’s jurisdiction in criminal appeals to questions of law alone. Despite a lack of fact-finding jurisdiction on appeal, the majority has ignored the rock-solid standard of review in criminal appeals requiring that we review the evidence in a light most favorable to the State, McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992), and that “it is the jury’s function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses.” Id. Unfortunately, in an attempt to rationalize the result reached, the majority has subjected the evidence to reweighing, reshaping, and augmentation through the summoning of “facts” from ethereal sources.[2]
*1151 In order to highlight the “shift” in the facts from the time this court issued its unanimous Order Dismissing Appeal (“ODA”) on August 15, 1989, until today’s version by the majority, I again recite the facts as recounted in our ODA:
On June 27, 1987, Wayne Ellison drank alcohol with appellants Merle Buffalo and Donna Street in a ravine near Fallon. Subsequently, a bottle was smashed over Ellison’s head knocking him to the ground. Appellants then kicked Ellison in the face, head, ribs and legs. Appellants beat Ellison with a stick with protruding nails, and one of the appellants (Ellison could not identify which) shoved the stick into Ellison’s mouth, knocking out several teeth. Ellison was then cut in the chest and back with a broken bottle, and a bottle was shoved up his rectum. Ellison escaped and called the police, who subsequently arrested appellants.
(Emphasis mine.)
In order to facilitate a ready comparison of the extent to which the facts have “changed” or “evolved” during the almost six-year period since we issued our ODA, I here repeat the majority’s current version of the facts:
Buffalo’s three felony convictions arose out of a fist fight that began when the “victim” of the crimes, one Wayne Ellison, assaulted Buffalo’s female companion, Donna Street. According to Ms. Street’s statement to the police, she and Ellison “got into a fight” and Buffalo “intervened” and hit Ellison. Buffalo claims that Ellison was “grabbing on Donna,” and that when he told the man to “keep his hands off,” Ellison punched him in the face. After this, the fight escalated, with Street and Buffalo hitting Ellison with fists, bottles and a “stick which had a nail protruding from it.” Ellison, a diabetic, had to be taken to the hospital. Buffalo and Street were taken to jail.
*1152 The reader will immediately note that now Ellison, the victim, has become a “victim” who first assaulted Buffalo’s female companion, Donna Street (a “fact” omitted from our original ODA). Also note that now Buffalo, whose credibility with the majority is remarkable, states that as he admonished Ellison to keep his hands off Ms. Street, “Ellison punched him in the face.” Alas, it appears the jury misfired, and the real victims were Buffalo and Street! Moreover, Ellison, whose diabetes now surfaces in the majority opinion, may have had to go to the hospital because of his diabetic condition and complications resulting therefrom when he aggressively assaulted his two victims, Buffalo and Street.
Moving on, the majority faults defense counsel for not presenting evidence “that harm done to Ellison was brought about by Buffalo’s trying to defend Ms. Street and defending himself against Ellison’s attack.” Tsk, tsk, the State prosecuted the innocent victims and allowed the real culprit, Ellison, to go scott free! It gets better. Tragically, defense counsel “had not learned” either from the credible Street or Buffalo (neither of whom saw the need to testify at trial, no doubt because of their obvious innocence) “that Buffalo’s initial attack on Ellison was made in defense of himself and his woman companion.” Sitting as the triers of fact, the majority have now moved full circle from the position reflected by their signatures on the ODA, to their present factual determination that Buffalo acted in defense of himself and his friend, Donna Street. More incredibly, the majority have summoned previously suppressed insights that enable them to assert with certainty that if defense counsel had simply bothered to interview Buffalo in some depth, she would have learned that Buffalo’s attack on Ellison, the “victim,” was in self-defense and in defense of his helpless female companion!
As the majority opinion unfolds, it continues to find additional facts that the jury should have heard. Thus, the majority asserts that neither Ms. Street nor Buffalo testified at the trial, so that the jury heard no testimony other than that of Mr. Ellison, the person who attacked Street and Buffalo. Moreover, the majority have now decided that the State did not have an “overwhelming” case. First, the majority concludes that the case for sexual assault is weakened by lack of physical evidence of the assault, the fact that Ellison (you will recall he started out the victim in our 1989 ODA, but is now the diabetic aggressor) does not know who assaulted him and that Buffalo says that Street tried (with a powerful motive) to assault Ellison with a bottle.
Incredibly, the majority now also concludes that it does not appear that it is legally possible for Buffalo to have committed this crime [mayhem]. The majority, adverting to the district *1153 attorney’s argument concerning Ellison’s loss of some teeth, immediately thereafter downgrades the plural “teeth” to the factual finding of a singular “tooth” that was lost by extraction performed by a dentist. The majority, seriously doubting that a “tooth” can be a “member” of the body, simply dismisses out of hand, the mayhem conviction with the verbal flourish that “[i]n whatever manner Buffalo might have injured Ellison’s mouth when he hit him, this is not a mayhem case, even if the injury resulted in a later tooth extraction and replacement by a dentist.”
Finally, the majority concludes its factual rhapsody by noting that hitting the aggressive diabetic, Ellison, in the mouth with a stick with a nail protruding from it, is “hardly an ‘overwhelming’ case of assault with a deadly weapon.”
The major mystery in this case is how this court, including the three justices who now form the majority in the instant matter, could have been so myopic in the issuance of its 1989 ODA. Why didn’t we then see that the diabetic Ellison was the real culprit who should be serving prison time rather than Buffalo? After all, today’s triers of fact have revealed that Ellison was the aggressor, that he had raped Street when she was a child, that Buffalo and Street were only trying to defend themselves against Ellison, that Ellison only suffered the loss of a tooth by dental extraction (an experience we have all shared), and that the entire affray was no big deal. Like Paul Harvey, I will provide the “rest of the story.”
The reader must keep in mind what I mentioned at the outset of this dissent: the majority opinion is a modern-day reflection of Plato’s expression that “necessity is the mother of our invention.” The majority, no longer able to contain the desire to bail Buffalo out of prison, has invented a concoction of fact, fiction and law to create Buffalo’s passport to freedom. I will explain.
The scapegoat in the majority’s story, er, opinion, is Buffalo’s trial counsel who has now been exposed as having been asleep at the switch. While asleep, trial counsel failed to: (1) conduct a proper investigation; (2) make an opening statement at trial; (3) call witnesses; (4) proffer slam dunk defenses of self-defense and defense of others; (5) spend sufficient time conducting legal research; and (6) present a cognizable defense.
Interspersed among the foregoing indictments are the newly found and massaged facts as found by the majority. Now the rest of the story:
1. The majority repeatedly alludes to the possibility that there were uncalled witnesses who could have offered exculpatory evidence, and that defense counsel’s failure to secure testimony from ambulance attendants, police personnel, and neighbors resulted in an entirely deficient defense on behalf of Buffalo. Not so. Defense counsel testified that she interviewed a neighbor, Mr. *1154 Duffney, who was called upon by a police officer to assist him in apprehending Buffalo and Street, who were seen running from the crime scene laughing. Moreover, defense counsel also recalled at the post-conviction hearing that Buffalo supplied her with no information that warranted investigation. Indeed, the now beleaguered attorney testified that she had intended to contact Buffalo’s friends and family, but her client insisted that she not notify or consult with anyone. Furthermore, at his arraignment, Buffalo stated that his counsel had fully apprised him of the charges against him, and that he, Buffalo, had provided his attorney with all of the facts and circumstances that resulted in the charges against him, as well as any possible defenses. Buffalo also acknowledged his satisfaction with his attorney’s representation.[3]
Of added importance, the district court judge who presided over the arraignment, trial, judgment and sentencing, writ of habeas corpus proceedings, and post-conviction proceedings, described Buffalo’s attempt to discredit trial counsel’s investigation as a mere “fishing expedition.” The on-the-scene judge further noted that “[i]f he [Buffalo] knows of some exculpatory evidence that she [Buffalo’s trial counsel] should have discovered, he could suggest it to the court. He hasn’t. He hasn’t suggested one item [trial counsel] could have obtained from talking to anybody.” Neither, might I add, has the majority.
It should also be noted that neither Buffalo nor the majority has suggested what exculpatory or even useful information could have been obtained from ambulance attendants, police personnel (who did take statements and testify) and other neighbors. Of course, defense counsel did interview the percipient neighbor *1155 who saw Buffalo and Street running from the crime scene and who, with his son, helped apprehend Buffalo.
There was another neighbor, Mr. Fontecchio, who had seen Buffalo and Street walking back, carrying what appeared to be a bottle in a sack, and cursing at Mr. Fontecchio and “the church [Fallon Christian Fellowship]” and “the pastor.” Fontecchio described the cursing as “sickening words coming out of their mouths.” Mr. Fontecchio watched as they walked behind the house and towards Rattlesnake Hill.
Sometime later, Fontecchio heard his dog barking, went outside to investigate and saw a “stark naked” Indian (Ellison) standing there “looking] like something out of a horror movie, you know, his teeth knocked out, there was blood all through his hair. His body was all scratched up. It looked like he had been beat on by a million people. That’s a little exaggeration, but that is exactly what it looked like.” Continuing, Mr. Fontecchio immediately went next door and called the police and thereafter returned with a “buddy” to the back of his house, where the beaten Ellison was “laying down” by a little hay cube “curled up like he was cold.” Asked again to describe the victim, Mr. Fontecchio testified that “first of all, his teeth were knocked out of his head. There was blood all over his face, and it was all up in his hair, and it looked [sic] gouges in his chest, and there were scratches everywhere. It was a sickening sight.” He also stated that Ellison’s backside “was the same thing as the front, if not worse.” Medical testimony also indicated that when Ellison was treated by arriving paramedics, his diastolic blood pressure was zero, and he was in shock.
As noted above, one cannot help to be amazed at how the stark naked, diabetic Ellison, who was found bleeding profusely, in cardiovascular shock with a blood pressure of 78/0, could have pulverized his victims, Buffalo and Street. All the more amazing, the two real victims, Buffalo and Street, were also seen by Mr. Fontecchio leaving the scene of “their beating,” laughing and walking back “towards the empty field.” Given the majority’s finding that Buffalo and Street were the true victims of a vicious assault by the aggressive diabetic, Ellison, the former two must have been delirious in their laughing and sauntering back to the field. Another mystery the majority has held close to its collective bosom is how it was that Buffalo and Street were covered with Ellison’s blood, when they were the ones who should have been bleeding.
Perhaps the majority understands why defense counsel, who testified that she was aware of what these percipient witnesses had seen because the district attorney had an open file policy, *1156 should be pilloried for not interviewing Mr. Fontecchio and the apprehending officers and paramedics. Somehow, I do not believe it would have made a difference, or would have made counsel any more effective. Unfortunately, it appears that the only way she could have made a “silk purse out of a sow’s ear,” would have been to have had the majority on the jury.
2. The majority’s primary criticism of defense counsel is truly a tour de force. She had somehow managed to overlook the compelling defenses of self-defense and defense of others. Unfortunately, if the majority had dug a little deeper, it may have noticed that the sole hint of such avenues to acquittal consisted of the self-serving, handwritten statement which the Department of Parole and Probation secured for its pre-sentence report. Buffalo’s effusive catharsis thus surfaced for the first time some seven months after the date of the offenses, and one month after the trial. It strikes me as odd that the majority would find defense counsel ineffective for not having divined “defenses” never articulated by either her client, Buffalo, or the victim at any time prior to or during trial. Perhaps the new standard for effective assistance of counsel includes an element of clairvoyance. Indeed, the majority now takes the position that if defense counsel had simply talked to Buffalo, all of this truthful self-defense information would have been explained to her, thus enabling her to provide the jury with the true, compelling nature of what had actually happened in this drunken “affray.”
It is also interesting that Buffalo’s co-defendant, Street, failed to mention in either her initial statement to the Fallon police or her taped interview with Officer Goodrick, that the aggressive diabetic, Ellison, struck Buffalo in the face. There is also no mention of Ellison striking Buffalo in the face in the pre-sentence report. Odd. Equally baffling is Buffalo’s failure to mention to police this factual basis for branding Ellison as the aggressor until one month after his trial.
Even if we were to succumb to the majority’s belief in Buffalo’s veracity in his post-trial indication that the diabetic Ellison had struck him in the face, the primary “defenses” conjured up by the majority resemble both the smell and appearance of Limburger and Swiss cheeses. Although Buffalo claimed in his self-serving, belated handwritten statement that Ellison hit him in the face, the police and pre-sentence reports revealed that Buffalo showed no signs of bodily injury to account for the blood on his pants, shoes, upper body, and arms at the time he was apprehended while fleeing from the scene of the crime. Moreover, the apparently light-hitting Ellison was, according to Buffalo’s statement, rendered unconscious.[4]1 suggest, therefore, *1157 that the majority’s theories of self-defense and defense of others are more than a little fanciful, and in any event, hardly support a finding of ineffective assistance by defense counsel.
Continuing with the majority’s “tour de force,” it somewhat stretches credulity to seriously entertain thoughts of self-defense and defense of others in the face of the vicious sexual assault and disfigurement suffered by an inebriated, naked, and unconscious Ellison. Likewise, such defenses would be equally implausible if the majority elected to follow co-defendant Street’s claim that Ellison was knocked out after allegedly challenging Buffalo to a fight. Furthermore, logic is stretched to greater lengths in assuming that Buffalo and Street would purchase more alcohol with the benevolent Ellison’s money and thereafter return and continue drinking with the man who posed such a threat to them. Of course, if we were to be so audacious as to give credence to the jury’s findings, it would not be difficult to accept Ellison’s testimony indicating that when Buffalo and Street returned to the ravine with more liquor, some words were spoken that culminated in either Buffalo or Street breaking a bottle over Ellison’s head. The severe beating and sexual assault that followed rendered Ellison defenseless since he was drunk and did not have the energy to fight back. Considering Ellison’s state of extreme vulnerability, the savage beating he received could hardly be viewed in the context of self-defense or defense of others.
3. The majority has little cause for ridiculing defense counsel for attempting to remove the “sexual” aspect from the sexual assault charge against Buffalo. Perhaps the majority’s criticism would have a tad more bite to it if it contained viable alternatives to the innovative and reasonable attempt by defense counsel to demonstrate that the facts were not truly reflective of a sexual assault. Instead, the majority resorts to belittling counsel’s efforts with the simplistic, unenlightened notion that “if counsel had spent perhaps fifteen minutes in legal research she would have been able to convince herself that sexual gratification is not an element of the crime of rape.” Unfortunately, the majority has granted a leave of absence to common sense.
Although “gratification” is not an element of sexual assault, “sexual” is clearly a component of the crime. “Penetration,” under NRS 200.366(1) must be “sexual” penetration. As counsel argued, a mother placing a thermometer in her child’s rectum, while probably accomplished against the child’s will, is certainly not sexual assault, despite the presence of penetration. Moreover, *1158 it is no accident that the crime is defined as “sexual” assault, as opposed to simple assault or assault with a deadly weapon or even aggravated assault. The dictionary definition of the word “sexual” is: “1. of, pertaining to, or for sex: sexual matters; sexual aids. 2. occurring between or involving the sexes: sexual relations. 3. having sexual organs or reproducing by processes involving both sexes.” The Random House Dictionary 1755 (2d ed. 1987). Defense counsel used the analogy of the mother and her child to merely illustrate the point that there was nothing “sexual” involved in shoving the bottle up Ellison’s rectum; that Buffalo was therefore deserving of nothing more harsh than the lesser included offense of battery, which carries a significantly lighter sentence. The defense, in my judgment, was reasonable, plausible, and, if developed by defense counsel in less than fifteen minutes of research or contemplation, brilliant and insightful. So, in an effort to balance the ledger against the majority’s “no-defense-at-all” characterization of counsel’s efforts, I commend her for her insightful recognition of a common sense approach to convincing the jury that there was nothing sexual about the rectal assault against Ellison.[5]
4. Next, the majority fantasizes about the record revealing no evidence of an anal assault on Ellison other than the testimony of the real villain, Ellison himself. Of course, this evaluation also descends from ethereal realms. Officer Goodrick testified at the preliminary hearing that he found a clear glass Black Velvet whiskey bottle which had blood impressions on the bottle and some type of sticky body fluid on the neck which appeared to be darker than blood. Officer Goodrick also testified that an additional identifiable characteristic of the bottle was the smell of human feces. Interestingly, the majority also observes, as triers of fact, that Buffalo asserted, “quite believably,” that “the reason Ms. Street tried to rape Ellison in this [the bottle] manner was her desire for revenge for Ellison’s having raped her when she was a child[.]” Evidently Buffalo also recognized that a bottle played a role in what happened to Ellison. Indeed, the majority must have *1159 either overlooked or paid no attention to Ms. Street’s statement indicating that she saw Buffalo shove “a bottle up his [Ellison’s] ass.” Finally, the majority asserts that Buffalo “was never given the opportunity to testify and to convey this vital [quite believable] information to the jury.”
The majority has drawn from thin air the proposition that Buffalo did not have the opportunity to testify and demonstrate how believable he was. Not even Buffalo’s counsel in the instant appeal has suggested that Buffalo’s trial counsel was ineffective for not having Buffalo testify at trial. There is a good reason why Buffalo did not testify. In the first place, as I will discuss in greater detail later, the evidence of guilt was overwhelming. More importantly, Buffalo’s criminal background involving acts of violence is extensive. As stated by the trial judge at sentencing:
You [Buffalo] have got a record that goes back to 1984, 32 arrests, 28 convictions, all misdemeanor convictions but they include a number of batteries indicating that if you see fit to beat somebody up, you do it. In this particular instance you just didn’t beat him up, you practically killed him.
5. The majority, as triers of fact, have found Buffalo’s post-trial statement about Ms. Street having been raped by Ellison when she was a child “quite believable.” I do not; neither did the trial judge who heard all the evidence and was aware of the statements by Buffalo and Street. In the first place, when Street made her first statement to the police, she made no mention of any previous rape by Ellison. She did, however, provide a graphic description of Buffalo breaking twenty to thirty bottles over the victim’s head, carving and cutting the victim with bottles, stripping him of his clothes, and shoving a whiskey bottle up Ellison’s rectum. She also described how Buffalo tried to carve his initials into the victim’s body and struck him with a board containing protruding nails. She concluded by disclaiming involvement other than getting blood on her clothes when she tried to stop Buffalo from hurting the victim. I wonder how believable the majority finds Ms. Street’s statement?
Moreover, the police investigated and found no evidence that anyone had ever reported or claimed that Ellison had raped Street as a child or otherwise. Finally, in sentencing Street, the trial judge commented:
Now, if this man [Ellison] had assaulted you when you were 14 years old, and you had some fear of him, it does not stand to reason that you would have stayed out there with him for an entire day, drank with him to the point where you were all intoxicated beyond belief. It just doesn’t stand to reason, and I don’t believe you quite frankly.
*1160 6. The majority, in a continuation of its delirium, opines that “this is not a mayhem case.” The triers of fact have now concluded that Ellison lost only one tooth by means of dental extraction, and that it is questionable whether a tooth could be a “member” of the body. I will not succumb to the temptation to comment on this frivolity other than to note that the mouth, about to receive a bite of juicy steak, could hardly say to the teeth, “I have no need of thee.” I merely note that all members of the majority joined with the rest of us in concluding, in the order dismissing the direct appeal, that it was unnecessary to address whether the loss of teeth may constitute mayhem, because “[t]he carving on Ellison’s back was sufficient to support the conviction of mayhem.” Perhaps the majority is now suffering from buyer’s remorse, for the facts in this case have not changed since we issued our order dismissing Buffalo’s appeal.
7. As I previously noted, the evidence of Buffalo’s guilt was overwhelming. In dismissing the petition for post-conviction relief, the trial judge stated: “The evidence was overwhelming, overwhelming, and it was a vicious crime. It could have resulted in the death of the individual, and the court can find absolutely no fault with Miss Hansen’s representation of this defendant.” Was the evidence overwhelming? Let us consider it once again.
A. An impartial eyewitness, Mr. Fontecchio, saw the victim, Ellison, beaten to a pulp, and stark naked. He was bleeding profusely. He curled up in a fetal position, as if cold. Buffalo and Street left the crime scene laughing, clothed, and casually walking towards an open field.
B. When it became apparent that they were being sought, Buffalo and Street commenced running and clearly attempted to avoid apprehension.
C. Officer Goodrick, summoned to the scene by Mr. Fontecchio, found Ellison with obvious face and chest injuries and immediately called for an ambulance. He also saw Buffalo and Street running through the field, as Mr. Fontecchio said “[tjhose two indians over there did it.” Officer Goodrick called Corporal Wilmoth for assistance, informing him of the location of the two suspects. Officer Goodrick again turned to Ellison, and concluded upon examination that he “had substantial head injuries and a large laceration on his chest and many more cuts and punctures on his body.” Officer Goodrick informed Corporal Wilmoth that he thought the victim had been knifed and stabbed. While waiting for the ambulance, Officer Goodrick asked Ellison what had happened, and the only answer he received was, “they tried to kill me.” The officer said Ellison was disoriented and appeared to be in a state of shock.
When Buffalo was finally tackled and apprehended, Officer *1161 Goodrick noted that he had blood on his pants and shoes, but had no injuries to account for the blood (the evidence revealed that the blood was consistent with that of Ellison, but not consistent with either Buffalo or Street). Later, at the station, Officer Goodrick interviewed Ms. Street, who appeared sober. She first told the officer that she and Buffalo were just walking through the area and didn’t see anyone. Asked where all the blood on her clothing came from, she became nervous and then said that Buffalo had beaten her up. When advised that she evidenced no injuries that would account for the blood, she repeated only that Buffalo had beaten her.
Next Officer Goodrick went to the hospital to see Ellison, and observed “massive swelling and cuts on Mr. Ellison’s head and a large cut on his chest.” The officer described the cut as “about V2" to 3k" deep and . . . laying open approximately a V2"; the cut was about 12" long.” Paramedic Ball also showed the officer a puncture wound below Ellison’s right shoulder which Ball said almost punctured Ellison’s lung. Continuing, Officer Goodrick said that he photographed Mr. Ellison’s injuries while he was on the examination table, “which included cuts down both legs and on his back. There were numerous cuts on his back, including a cut that looked like the letter ‘Z’. Mr. Ellison also had several small puncture wounds in his chest area.”
After retrieving numerous broken bottles with blood on them, a pair of dark blue pants and two tennis shoes with blood splatters on them, a blue striped shirt covered with blood on a bench that also had blood splatters on it, and a total of 22 items of evidence in all, the officer again returned to the hospital, where Ellison was now in the intensive care unit. He was able to hear Ellison tell him that an Indian couple, “a girl and a guy, had tried to kill him.” The officer also determined that Ellison had been wearing dark pants and a gray shirt.
During a second interview with Ms. Street, she agreed to waive her Miranda rights and tell Officer Goodrick the whole story. The taped interview revealed the following story from Street:
She and Mr. Buffalo had been drinking at the railroad tracks with Wayne Ellison. They drank and had a good time for awhile but later she and Mr. Ellison got into a fight. Mr. Buffalo jumped in and hit Mr. Ellison over the head with a bottle. He then hit him, kicked him and threw more bottles at Mr. Ellison. According to Ms. Street, Mr. Buffalo broke 20 to 30 bottles over Mr. Ellison’s head, carved and cut him with the broken bottles. Mr. Buffalo later stripped all Mr. Ellison’s clothes off of him and cut him some more. She also stated that “he shoved a bottle up his ass.” She said it was a *1162 Black Velvet whiskey bottle. She further said that Mr. Buffalo tried to carve his initials into Mr. Ellison’s body and he hit Mr. Ellison with a bench and then with the broken board from the bench which had nails in it. According to Ms. Street, she didn’t help Mr. Buffalo, she tried to stop him from hurting Mr. Ellison. She also told me that the blood on her was from trying to stop Mr. Buffalo.
Predictably, Buffalo had a different story to tell to parole and probation authorities [the people who would be recommending the sentence he should receive] one month after his trial. He said that he and Ms. Street had been drinking with Ellison in the morning and when they ran out of liquor, he and Street left to purchase some more liquor. On the way back, Street allegedly told Buffalo about being raped by Ellison when she was age eleven, and that she was afraid of him. Buffalo claims, in the Pre-sentence Investigation Report, the following:
They rejoined the victim and were in the process of getting drunk when the victim started grabbing Ms. Street’s breasts and started talking about pulling a train on her. The defendant told him [Ellison] to keep his hands off Ms. Street. The victim replied with a derogatory remark at which time Mr. Buffalo punched him in the face, knocking him out. He then sat down with his codefendant and they were laughing about the situation when Ms. Street said she wanted to pay the victim back for raping her. She then picked up a piece of glass, ripped the victim’s shirt open, and began carving on his chest. Mr. Buffalo related that he sat and watched this go on. Ms. Street then said she wanted to put a whiskey bottle up the victim’s rectum because of the hurt she had sustained when she was raped. She then took the victim’s pants off, rolled him over on his stomach, and stuck the bottle in his rectum. The victim then woke up and walked toward the City of Fallon.
Buffalo also commented that “[h]e feels that he has been found guilty of something he did not do, advising that Ms. Street is the one who beat on the victim and hit him with the bottles.” Buffalo also said that he had no reason to do “that sort of thing to anybody,” and described himself as “mellow, nonviolent, a different person when sober.” Just imagine how believable Buffalo’s story is. He gave Ellison one knockout punch, he and Street then laughed, and then she decided she wanted to carve Ellison up and shove a Black Velvet whiskey bottle up the victim’s rectum. All the while, Buffalo’s knockout punch was so powerful, Ellison remained unconscious through it all.
One thing is certain. Either Buffalo or Street or both beat *1163 Ellison to a pulp and shoved a bottle up his rectum. The investigating officer even found the Black Velvet whiskey bottle and the evidence of blood and human feces that reflected the truth of what both Buffalo and Street accused each other of doing. The majority can ruminate all they wish about whether the evidence is overwhelming, but I suggest that there was little basis for doubt in what the jury had to decide. The trial judge and the jury had no difficulty determining who the guilty parties were and the seriousness of their offenses. Indeed, medical testimony indicated that the injuries sustained by Ellison could have been fatal if he had not received timely treatment.
9. Finally, notwithstanding the overwhelming evidence of Buffalo’s guilt, the majority insists that defense counsel failed to invest sufficient time in investigating and preparing for Buffalo’s trial. Why, she even elected to forego an opening statement. I suppose the majority would have preferred to have Buffalo’s version of events revealed in an opening statement, placing all the blame on Street. Street’s counsel, of course, would then have retaliated with Street’s detailed version of Buffalo’s vicious attack on Ellison. Imagine the spectacle, also, that would have resulted from the majority’s preference for Buffalo’s testimony on the stand. This, too, would have forced Street to take the stand and blame Buffalo for all of Ellison’s injuries, including the rectal assault with the bottle.
Despite all of this, the majority wants to see defense counsel justify not meeting with the police, the ambulance personnel, and neighbors in pursuit of the hope that Ellison may have had a slip of the tongue and confessed that he had viciously beaten Buffalo and Street, the latter of whom he had earlier raped. Defense counsel knew exactly what the facts were and that Ellison was not in a position physically or mentally, to have admitted to culpability that did not exist.
Moreover, the majority has provided misleading information about the time defense counsel invested in Buffalo’s case. The majority fails to consider counsel’s efforts in researching, drafting and arguing a pretrial motion for a writ of habeas corpus, preparation and time involving the preliminary hearing, motion for separate trials, stipulation for withdrawal of motion for severance, stipulation for chain of custody, and consulting with Buffalo.[6] Also, as defense counsel indicated, there are always other elements of preparation that do not show up on time sheets. In any event, one need only review the transcript of the trial to realize that defense counsel was well prepared, and provided *1164 Buffalo with the best defense under the circumstances. Buffalo gave defense counsel the names of no witnesses to call on his behalf, and expressly directed counsel not to involve his family.
To have presented the “defense” of self-defense and defense of others, as urged by the majority, would have made defense counsel appear ridiculous and disingenuous under the facts of this case. Furthermore, defense counsel was more than a little resourceful and perceptive in trying to convince the jury that the sexual aspect of the crime of sexual assault was missing in this case, and that simple assault was the more appropriate offense since the offense was calculated only to inflict pain on the victim without any evidence of a sexual component.
I am simply unable to subscribe to the majority’s attempt to assuage Buffalo’s sentence by pinning the label of ineffective assistance of counsel on Buffalo’s trial counsel. She performed her duties well within accepted levels of competence, as emphatically noted by the trial judge. I regret that the majority fails to appreciate the seriousness of the crimes committed by Buffalo — a man who had demonstrated on many previous occasions his propensity for violence.
I am also disappointed that in seeking to manufacture a basis for Buffalo’s relief, the majority has shown not the slightest deference to the findings and the perceptions of the district court judge who presided over all of the proceedings beyond the preliminary hearing. Judge Recanzone realized that Ellison was the victim of vicious crimes that could have resulted in his death. Moreover, the judge also witnessed defense counsel’s performance and at the post-conviction hearing emphasized that he could “find absolutely no fault with Miss Hansen’s representation of this defendant.” All for naught.
Finally, I consider it the sheerest irony that the majority, after pledging allegiance to factual neutrality, impugns defense counsel’s efforts (with no support under Strickland, I might add) by declaring that defense counsel “never really found out that this was a self-defense case in which Buffalo’s violence was provoked by Ellison’s attack upon Buffalo and his female companion, Ms. Street.”
Sadly, the majority never really found out that this was not, by any stretch of the imagination, a self-defense case. Whether judged by Buffalo’s own unsworn, post-trial statement or Street’s statement to the police, it is irrefutably clear that this was not a self-defense case. Buffalo’s statement simply indicates that Ellison made a “derogatory remark at which time [he, Buffalo] punched him in the face, knocking him out.” What a marvelous example of self-defense upon which to base the majority’s rever *1165 sal of Buffalo’s convictions! Street, on the other hand, stated that Buffalo “jumped in and hit Mr. Ellison over the head with a bottle. He [Buffalo] then hit him, kicked him and threw more bottles at Mr. Ellison.” Continuing, Street declared that Buffalo “broke 20 to 30 bottles over Mr. Ellison’s head, carved and cut him with broken bottles. Mr. Buffalo later stripped all Mr. Ellison’s clothes off of him [recall that Ellison was discovered by a neighbor stark naked and beaten to a pulp] and cut him some inore.” Finally, Street said that Buffalo shoved a Black Velvet whiskey “bottle up his [Ellison’s] ass,” and that she tried to stop Buffalo from “hurting Mr. Ellison.” There, in all of its glory, is the majority’s case for self-defense! There is the basis for declaring defense counsel ineffective!
For the reasons discussed above, I respectfully dissent.

Unfortunately, this court is faced with an overwhelming caseload that strains our limited resources and energies. I have therefore elected not to engage in an extensive revision of this dissent in order to respond to the shifting sands and nuances of the majority’s changes spawned by my original dissent. As a result, there may be certain aspects of this dissent that will not fully track the revised majority opinion. Although I apologize to the reader for this, I note that in almost all particulars, this dissent remains responsive to the majority’s opinion.

In the majority’s most recent opinion (to which this dissent will hopefully apply), the majority has taken pains to disavow doing what it patently has done, i.e., given almost total weight and credence to Buffalo’s unsworn, post-trial version of the events. Thus, the majority notes that “[tjhis court can, of course, make no judgments on the facts in this case.” After the meaningless disclaimer, the majority laces its opinion with such comments as “[tjhere is, however, a certain coherency and believability in Buffalo’s version of the events.” Continuing, and only by way of example, the majority hyperbolizes as follows: (1) “In post-conviction proceedings, however, an *1151 entirely different scenario revealed itself;” (2) “Had all the facts been presented . . . [thus implying if not assuming outright that Buffalo’s post-trial reflections were factual];” and (3) that Buffalo’s version constituted “vital information;” as to “what really happened at the scene of the crime.” Finally, in footnote 10, the majority abandons all semblance of neutrality in observing “[d]efense counsel did not even attempt during cross-examination to show extenuating circumstances, much less the compelling self-defense tenor of this case.” (Emphasis added.)
Reliance on Buffalo’s belated explanation continues throughout the majority’s opinion. In footnote 7, the majority exchanges its appellate robes for jury attire and states “[evidence of Buffalo’s previous drunken brawls] would not have been nearly as harmful as Buffalo’s silence and the jury’s knowing nothing of Buffalo’s version of the events.”

Despite the seriousness of the majority’s reversal of a sound and fair judgment of conviction, I am somewhat amused at the majority’s efforts to credit Buffalo at the expense of defense counsel. The majority can think of no reason why defense counsel did not have Buffalo testify other than she “simply did not know that Buffalo had a story to tell.” I can think of several. First, when defense counsel interviewed Buffalo prior to trial, he did not have a story to tell; he had not yet developed it. I find that prospect far more believable than the extravagant thought that defense counsel did not bother to ask Buffalo about the facts of the case. Second, Buffalo undoubtedly knew that if he attempted to tell his “story” about Street doing all the carving and bottle shoving, Street would have produced a far more believable story about Buffalo pulverizing Ellison and then “shoving a bottle up his ass.” Moreover, Buffalo, in attempting to paint himself out of his corner of conviction, described himself as “mellow” and “nonviolent,” someone who had no reason to do “that sort of thing to anybody.” It takes little imagination to envision the impeachment spectacle with Buffalo on the stand defending his self-described qualities against a record of 28 misdemeanor convictions, including, as described by the district court judge, “a number of batteries indicating that if you see fit to beat somebody up, you do it.”

I find it intriguing that the majority seriously posits the criticism that defense counsel presented no evidence that “harm done to Ellison was *1157 brought about by Buffalo’s trying to defend Ms. Street and defending himself against Ellison’s attack.” Perhaps counsel thought that she may have been laughed out of court if she had argued that Buffalo and Street forced a bottle up the unconscious Ellison’s rectum and carved up his torso in desperate acts of self-defense.

I suggest that the majority is entirely too superficial in discounting defense counsel’s attempt to convince the jury that “some sexual connotation must be present before the insertion of the foreign object into the anal opening is sexual assault.” I find it interesting that the majority fails to recognize the obvious — that the crime of sexual assault does have to have “some sexual connotation” to it. The “sexual” aspect of the assault is what distinguishes it from other forms of assault. For example, the definition of “sexual penetration” under NRS 200.364 includes “any intrusion, however slight, of any part of a person’s body . . . .” Given the majority’s unwillingness to ascribe meaning to the term “sexual” in the crime of sexual assault, I suppose the State could have charged Buffalo with another count of sexual assault for penetrating Ellison’s mouth and knocking out some of his teeth.

This criticism has been ameliorated by the revision of the majority’s opinion.