915 P.2d 291 (1996)
112 Nev. 72
WINNERFORD FRANK H., AKA, Winnerford Frank T., a Minor, Appellant,
v.
The STATE of Nevada, Respondent.
No. 24921.
Supreme Court of Nevada.
April 30, 1996.
Morgan D. Harris, Public Defender, Sharon G. Dickinson, Deputy Public Defender, Clark County, for Appellant.
Frankie Sue Del Papa, Attorney General, Carson City; Stewart L. Bell, District Attorney, James Tufteland, Tim O'Brien, Chief Deputy District Attorneys, Ronald C. Bloxham, Deputy District Attorney, Clark County, for Respondent.

OPINION
SPRINGER, Justice:
This case is about a ten-year-old boy, Winnerford H., who was convicted ("adjudicated") *292 by the juvenile court to be guilty of sexual assault (formerly rape), a crime that he is charged with committing while he and a number of other children were playing a children's group game called "hide-and-go-get it."[1] One of the game players claimed that in the course of the game Winnerford placed his finger on her "privacy."
Winnerford and Kedrick and Shamoya and Latoya and Angelo and Marcello and Crissie (the "victim" of this crime) and some other children were engaged in a game that they called "hide-and-go-get-it," "it" being the girls' external genitalia. (As put by Crissie herself: "[T]he boys catch you, they throw you down and do it to you.") The three boys who "got it" during the game with Crissie and the other children were Angelo, who held her hands, and Marcello who held her "feets" and Winnerford, who Crissie claims "touched" her "privacy."[2] Crissie testified that Winnerford's touching was "real quick, just like touching and let off." Crissie answered the prosecutor's question during her direct testimony as follows:
Q. Okay. You said he put his hand inside your privacy. Does that mean he actually went inside of you or did he just touch the outside of you?
A. Just the outside of me.
Q. Did he go inside of you at all?
A. No.[[3]]
One of the child witnesses, a ten-year-old, whom we shall refer to as "K.S.," testified concerning the particular "hide-and-go-get-it" game that the children were playing on that fateful day. First K.S. identified the "defendant," Winnerford ("He's in a white tuxedo and a black bow tie.") and explained the rules of the group game: "You got to chase a girl, and if you get her you've got to do real nasty stuff to her." Crissie, the "victim" in this case was at first mainly upset because the other children did not include her in the game. No one would chase her and do "nasty stuff" to her, that is, until (as put by K.S.), "she started crying for it." Crissie was very upset because everyone was chasing Annie and not her; and Crissie "started crying, [and] said, `Frank, you never come get me. Frank, you never come get me.' And she kept crying, [and] saying that." Crissie's sister, Alecia, got so upset because of Winnerford's inattention to her sister that she refused to play hide-and-go-get-it anymore unless Winnerford agreed to go after her sister, Crissie. After this conversation, Crissie, according to the testimony, "just laid on the slide waiting for him [Winnerford] to come and get her."
According to K.S., Crissie was "laying down backwards" on [the slide]." "She wanted somebody to get her before she get into it. So she laid down on the slide waiting for somebody to come and get her." K.S. and Charles grabbed her legs on the slide and pulled her up the slide. Winnerford came along and "touched her outside of her panties." "She never did have her panties off." "Charles moved her legs apart." Charles was "holding her legs." All the children were laughing until Crissie screamed, at which time Charles let go of her legs, and Winnerford took his hands off of her panties. Winnerford "was like he was on there like *293 five seconds and then she started hollering...."
Another ten-year-old witness, Latoya, testified basically to the same facts. She testified that Winnerford did not pull Crissie's dress up nor did he pull her pants down. Latoya testified that Winnerford put his hand up Crissie's dress and that he "jabbed her" twice with outstretched finger. The jabs were "sort of like real fast, like that [demonstrating]." Latoya explained on cross-examination that, at the time, Crissie's skirt was down to her knees and that she "saw his hand go under her skirt." This jabbing action apparently caused Crissie to suffer some pain, and this is when she "hollered" and put an end to her participation in the hide-and-go-get-it game.
Another eyewitness, a child named Tuesday, observed Winnerford feeling Crissie's legs "and her panties." She also saw Winnerford do basically the same thing that other witnesses had seen. "I saw Frank touch on her legs and close to her vagina, but he didn't really go real like into her panties. I saw him touch her panties. I saw him touch her panties, but he didn't go up in there." Tuesday also limits the episode to "about five seconds."
Given these accounts of the manner in which Winnerford played this game with Crissie, it is indeed doubtful as to whether there was such sexual penetration as to justify a rape conviction. None of the players who testified in this case testified that Winnerford had the time or opportunity to penetrate Crissie's vagina; and most of the players outrightly denied that this had occurred. There was no physical evidence to support a finding of vaginal penetration. There were many inconsistencies in Crissie's testimony, but we do not find it necessary to catalogue them in this opinion. On balance, it appears that her testimony that he "did not go inside" of her at all is considerably more persuasive on the question of penetration than her response to the leading questions of the prosecutor relative to what Winnerford did or did not do with reference to the representative "groove" in the prosecutor's hand. There is no direct testimony by Crissie or by anyone else that Winnerford inserted his finger into Crissie's vagina, and it is highly improbable that he did so. Although there is a very strong argument that there is insufficient evidence upon which the juvenile court judge could have found beyond a reasonable doubt that Winnerford penetrated Crissie's vagina with his finger, we choose not to rest reversal of Winnerford's conviction (adjudication) on the basis of insufficiency of the evidence but, rather, on the ground that the State failed to rebut the presumption that Winnerford did not have the legal capacity to commit sexual assault.
NRS 194.010 provides in pertinent part that
All persons are liable to punishment except those belonging to the following classes:
....
2. Children between the ages of 8 years and 14 years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness.
(Emphasis added.) Winnerford's counsel argues that the State failed to present clear proof that Winnerford knew the wrongfulness of his actions at the time he is said to have inserted his finger into Crissie's vagina.
Without citing in its brief any support from the record, the State claims that Winnerford testified that he did not want to touch Crissie between her legs because "he knew he was going to get in trouble." This, the State submits, is clear proof that Winnerford possessed the capacity to commit sexual assault. The testimony on which the prosecutor is apparently relying is the following, which was elicited during the prosecutor's cross-examination of Winnerford:
Q. You said you humped [Crissie]. What does that mean? What did you do to her?
A. When you get on top of her and do it to her.
Q. Describe what you mean by "do it to her".
....
A. Go like that on top of her.
Q. Can you stand up, show me what that is?
A. Like this.

*294 ....
Q. While you were on top of her, didn't you also place your hand between her legs?
A. No.
Q. Why didn't you place your hand between her legs?
A. Huh?
Q. Why didn't you place your hands between her legs? Didn't Charles get away with it?
....
A. I didn't do it. I didn't want to do it.

Q. You didn't want to do it?
A. No.
Q. Okay. Why did you want to hump her?
A. Huh?
Q. Why did you want to hump her?
A. I don't know.
Q. Okay. Why didn't you want to do that?
A. Huh?
Q. Why didn't you want to do that? Is it because you were afraid of getting in trouble?

A. Yeah. I said I didn't want to because I knew I was going to get in trouble.
Q. Okay. So you wanted to do it but you knew you would get in trouble if you did?
A. I still didn't want to do it. I wasn't thinking of it.

Q. You weren't thinking of it?
A. No.
Q. But you knew you would get in trouble if you did do that?
A. Yes.
(Emphasis added.) This testimony certainly does not present clear or adequate proof that Winnerford knew the wrongfulness of his decision to "go and get it," at the time he is alleged to have actually done so. The prosecutor's questioning was ambiguous. It is unclear what exactly he was referring to when he asked the leading question: "Why didn't you want to do that? Is it because you were afraid of getting in trouble?" It is not clear what "that" refers to. The preceding question referred to "humping," which the prosecutor and Winnerford distinguished from Winnerford's allegedly placing his hands between Crissie's legs. Further, it is not clear when Winnerford realized he could get in trouble if he placed his hand between Crissie's legs as he twice stated that he did not even think of placing his hands between Crissie's legs. Finally, Winnerford only testified that he knew he would get in trouble in response to the State's leading question.[4] There is nothing else in the record that relates to Winnerford's criminal capacity, and the above-discussed cross-examination does not suffice for this purpose. We conclude that the State did not present sufficient evidence to rebut the presumption that Winnerford was incapable of committing sexual assault.
The State did not prove beyond a reasonable doubt that Winnerford had the required mens rea to commit sexual assault. Sexual assault is generally considered a general intent crime. Manning v. Warden, 99 Nev. 82, 659 P.2d 847 (1983). NRS 193.200 defines intention as follows: "Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the persons accused." NRS 193.220 defines a person who is considered of sound mind as one who "has arrived at the age of 14 years, or before that age, if such person knew the distinction between good and evil."
The circumstances connected with the alleged offense have been previously describedthese children were playing a game. The accused is a ten-year-old child. The only evidence presented regarding whether he knew the distinction between good and evil is the testimony discussed above regarding whether the State failed to rebut the presumption that Winnerford did not have the capacity to commit sexual assault. This *295 testimony is not sufficient to establish beyond a reasonable doubt that Winnerford knew the distinction between good and evil for purposes of assessing whether he was of sound mind as contemplated by NRS 193.200. The State did not establish that Winnerford had the mental capacity to commit the crime of sexual assault at the time Winnerford is claimed to have put his hand on Crissie's "privacy"; therefore, the State did not prove beyond a reasonable doubt the Winnerford had the requisite mens rea to commit a sexual assault.
The adjudication of delinquency is reversed. Since the "hide-and-go-get-it" game was played over two and one-half years ago, we think it would be wise and in the interest of both Winnerford and the State of Nevada if this matter would be brought to a close. The juvenile court is instructed to dismiss all pending proceedings in this matter.
YOUNG and ROSE, JJ., concur.
STEFFEN, C.J., and SHEARING, J., dissented.
SHEARING, Justice, with whom STEFFEN, C.J., agrees, dissenting:
I would affirm the judgment of the district court adjudicating the subject minor a delinquent.
The majority purports to base its decision to reverse the adjudication of delinquency on NRS 194.010 and NRS 193.220. However, these statutory provisions apply to criminal convictions in the adult courts, not delinquency adjudications in the juvenile courts. Relying upon these statutes, the majority finds that the minor did not have the requisite intent to commit a crime, even if he intended to commit the act which would have been a crime if he had been an adult. If the minor had been convicted of a crime, the majority's argument might have some relevance, but he was not; he was adjudicated a delinquent. Whether or not the minor knew the act was wrong under the law is irrelevant. He intentionally did the acts, and that finding satisfies the requirement for an adjudication of delinquency.
By applying the cited statutory provisions to the juvenile proceedings, the majority has, in effect, deprived the juvenile court of the opportunity to completely fulfill its responsibility to the community and to children under the age of fourteen by making it extremely difficult, if not impossible, to hold children under the age of fourteen accountable for their delinquent acts.
At the time of this proceeding, NRS 194.010, upon which the majority relies, read in pertinent part:
NRS 194.010. Persons capable of committing crimes.
All persons are liable to punishment except those belonging to the following classes:
1. Children under the age of 8 years.
2. Children between the ages of 8 years and 14 years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness.
This statute was clearly enacted to define when a person may be convicted of a crime in the adult courts and to clarify the common law. The common law and statutory law regarding eligibility for criminal conviction has varied over the years. Under the early common law, children of any age could be held criminally responsible. Later, the common law rule held that children under the age of seven were conclusively presumed to be without criminal capacity, but there was a rebuttable presumption of incapacity for children from age seven to thirteen and children over thirteen were held fully responsible. Most states have adopted statutes that reflect these concepts, although the age of capacity has varied. NRS 194.010 was clearly designed to address these principles of criminal liability for children.
NRS 194.010 and its underlying precepts have no application to juvenile courts.[1] Our *296 juvenile courts were not established to secure criminal convictions. Rather, the juvenile court has exclusive jurisdiction over children who have committed delinquent acts, which are acts designated crimes under the law of the State of Nevada, if committed by adults. NRS 62.040(b). NRS 62.031(1) provides in relevant part, "[t]his chapter shall be liberally construed to the end that each child coming within the jurisdiction of the court shall receive such care, guidance and control . . . as will be conducive to the child's welfare and the best interests of the state...." A child is defined as a person less than eighteen years of age who has not been certified or sentenced as an adult. NRS 62.020(2). The adjudication here clearly comes within the umbrella of Chapter 62 and not the provisions applicable to criminal convictions in the adult court.
The majority's position requiring the State to prove that the juvenile knew that the prohibited act was wrong, rather than that the juvenile had general intent to perform the prohibited act requires greater proof than for an adult criminal conviction. This additional requirement virtually eviscerates the juvenile court's ability to provide "care, guidance and control" to juveniles under the age of fourteen in delinquency proceedings. It is incredible that the majority wants to mandate this heightened proof requirement in delinquency adjudications when it is clearly in the best interests of both the child and society that the child receive guidance as early as possible so that he or she may be influenced to conform his or her behavior to the proper standard. There is an enormous difference between an adult receiving a punishment of a life sentence for sexual assault and a juvenile receiving the counseling and temporary supervision that was provided here.
Even if the State was required to prove that the juvenile knew that his act was wrong, the State amply met its burden in this case. The minor's testimony clearly establishes that he knew the game was wrong. He described the game as getting on top of her and "doing it to her." When asked what "doing it to her" meant, he said "[n]asty things." In denying that he put his hand between the victim's legs, he said "I said I didn't want to because I knew I was going to get into trouble." Contrary to the majority's position, it is clear that the minor was referring to putting his hands between the victim's legs and not to "humping," since the minor admitted to "humping" the victim. This is ample evidence that the juvenile understood the wrongfulness of his acts at the time he performed them.
The majority purports to base its decision on NRS 194.010(2), but the opinion makes clear that the court is actually reweighing the evidence, arrogating to itself the function of assessing the weight of the evidence and determining the credibility of witnesses. That is not the function of this court. The trial court determined that sexual penetration occurred. Yet the majority states that "it is indeed doubtful as to whether there was such sexual penetration", and again "it is highly improbable that he did so."
Nevertheless, there is substantial evidence supporting the trial court's finding. The majority's doubt must be wishful thinking, because the testimony of every witness, including the perpetrator, supports the allegation of sexual penetration in some respect. The majority chooses to report only some portions of evidence, not even in context, that support its belief that no delinquent activity occurred. To suggest that every witness must admit to participating in wrongful activity before there is substantial evidence is both unrealistic and wrong. Determining the credibility of witnesses is the function of the trial court, not this court. McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). The appropriate standard of review for this court is the same as in a criminal case: "`whether, after viewing the evidence in the light most favorable to the [State], any rational trier of fact could have found the essential elements of the [offense] beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
Both the victim and another witness stated that the minor jabbed inside the victim with his finger. All but one witness who testified agreed that at one point, while the minor's hand was up the victim's skirt, the victim *297 cried out. The other witness also agreed that she cried out, but claimed that it was while another boy's hand was in the victim's panties. They all agree that the victim cried and complained about pain on the way home. One witness observed spots of blood when the victim went into the bathtub after she arrived home. The school counselor testified that the victim complained of burning in her vagina a day or so later. To suggest that this court is in a better position to evaluate this evidence and to conclude that no penetration occurred is ludicrous.
The majority states that "none of the players who testified in this case testified that [the minor] had the time or opportunity to penetrate [the victim's] vagina; and most of the players outrightly denied that this had occurred." This assertion is simply wrong. Every witness who testified acknowledged that the minor had the time and opportunity for penetration, even those who denied that it had occurred. Other than the victim and accused minor, only three of the children participating in the "game" testified. One of the witnesses was one of the boys who was holding the victim down while the accused minor was on top of her.[2] He denied seeing any penetration, but he certainly did not deny that the minor had the time and opportunity to do so. On the contrary, he was holding the victim down "for some time." He was also quoted as saying to the accused minor after the victim made her accusation, "[name], you shouldn't have did that." Even the accused minor admitted that he was lying on top of the victim, even though he denied otherwise touching her.
Another girl claimed she saw a hand inside the victim's pants, but claimed it was another boy's hand. However, she acknowledged that the accused minor touched the victim "on the legs and close to her vagina, but he didn't really go real like into her panties. I saw him touch her panties, but he didn't go up in there." The other witness testified that she saw the minor make two fast jabs under the victim's skirt. Contrary to what the majority says, every witness, including the accused minor, made it clear that the accused minor had both the time and opportunity to penetrate the victim. The evidence of penetration was not only substantial, it was overwhelming.
The majority cites lack of any physical evidence as one of the reasons for doubting that penetration occurred. Crimes which do not leave physical evidence when they are not reported to the authorities immediately can only be proven by testimonial evidence. Sexual assault is one such crime because it often fails to leave any physical evidence which can be brought to court. Here, even the testimony of a witness who said she saw blood when the victim took a bath immediately after the incident is not good enough for the majority. The suggestion that the lack of physical evidence is grounds to reverse the judgment and to reject the trial court's findings regarding the witnesses' credibility is outrageous! This is the type of reasoning which makes victims unwilling to come forward with allegations of sexual assault.
In the juvenile proceeding, the court determined that the subject minor had performed delinquent acts and adjudicated him a delinquent. Contrary to the majority's suggestion, the trial court certainly did not convict the minor of a crime and did not label him a "rapist" or subject him to anything resembling a life sentence as would be the case in adult court. This court has no justification for such an insinuation because it ignores the entire law and policy toward juveniles set forth by the Nevada legislature in Title 5 of the Nevada Revised Statutes. NRS 62.193(1) makes clear that "[p]roceedings concerning any child alleged to be delinquent. . . are not criminal in nature. . . ." (Emphasis added.) The act charged would be a crime if committed by an adult, but not when committed by a child.
*298 The juvenile court system is designed not to stigmatize children with labels as criminals, but to provide helpful guidance in teaching them appropriate conduct so that they will not become criminals in their adulthood. The disposition in this case reflects this aim. The district court placed the minor on formal probation for three years and ordered him to complete a Sexual Offense Specific Psychoeducational Program and to participate with his mother in family therapy. This disposition appears the most appropriate to protect the public and to satisfy the minor's rehabilitative needs.
The majority appears to regard the alleged actions as mere child's play. I strongly disagree. The children were playing a nasty game which foreshadows adult criminal activity if the children are not properly educated. The children may have regarded this as a game, but when a game involves sexual activity that would be a crime if performed by adults, the children certainly need to learn that this conduct is wrong. Other children need protection from the minor who continues such behavior, and the public needs protection from the minor who grows up thinking that this is acceptable conduct.
The judgment should be affirmed.
NOTES
[1] Rules of the game: "[T]he boys catch you, they throw you down and do it to you."
[2] Actually there are three ten-year-old sexual assailants (rapists) in this case if we wanted to carry the case to the limits of absurdity.
[3] On redirect examination the prosecutor was able to lead Crissie into describing what Winnerford "did with his hand":

Q. Let's take my hand, I'm going to take my hand right here.
A. Okay.
Q. And we'll pretend like this is your privacy part, okay. And I'm going to create a little groove for you, okay? Does this look something like what your privacy part looks like?
A. Yes.
Q. What I'm going to do is I'm going to hold this over here for you. Now, I want you to show me what Frank did with his hand, what you felt Frank do with his hand. Could you just show me?
A. Well, like that.
Q. Could you show me exactly how he did it. Go ahead and go slow and show me how he did it.
A. Like that.
. . . .
Q. Let the record reflect she put her middle finger in the groove I created between my thumb and the major part of my hand.
[4] Cf. Poole v. State, 97 Nev. 175, 625 P.2d 1163 (1981) (evidence presented that thirteen-year-old accused of murder hid murder weapon, as well as other pieces of evidence; fabricated stories in attempting to create an alibi; claimed the shooting had been accidental; and testified that he knew killing people was wrong sufficient to establish that the minor knew the wrongfulness of his act).
[1] The Model Penal Code takes this position, stating:

In barring criminal proceedings against offenders who are under 16 at the time of the conduct charged to constitute the offense, Section 4.10 renders moot the legal issue of criminal capacity of juveniles. Under this section, an individual under the age of 16 is accountable only in juvenile court.
Model Penal Code § 4.10 cmt. 2 (1985).
[2] The majority suggests that it would be the limits of absurdity to call two males "sexual assailants (rapists)" when they hold down a female while a third penetrate her sexually. That is outrageous! Just because the majority evidences a hostility to prosecution in this type of situation, there would be nothing absurd at all about such a prosecution if these males were adults. These boys are juveniles and would not be held to be guilty of a crime, but if the allegations are true, as the trial judge found, they certainly engaged in delinquent acts.