SCOTT E., A MINOR, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 25475

January 30, 1997                         931 P.2d 1370

*Morgan D. Harris,* Public Defender, and *Sharon G. Dickinson,* Deputy, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, *James Tufteland,* Chief Deputy, and *Pandora Rider Johnson,* Deputy, Clark County, for Respondent.

**OPINION**

By the Court, YOUNG, J.:

*FACTS*

On May 6, 1993, the State charged Scott E. ("Scott") with three counts of lewdness with a minor under the age of fourteen. The charges stemmed from accusations made by Tristain S. ("Tristain") alleging, among other things, that Scott touched her "between [her] legs."

On August 19, 1993, the court attempted to conduct a contested hearing. Defense counsel, along with Scott's family and witnesses, arrived prepared to proceed. The State, however, arrived with no witnesses. The State claimed that it did not subpoena its witnesses because it had agreed with defense counsel to make a joint request for a continuance. In addition, the State claimed that after it failed to subpoena its witnesses, defense counsel reneged and said that she would oppose any request by the State for a continuance. Defense counsel, however, subsequently informed the State that Scott and his family did not want a continuance. The State claimed that because the victim and her mother could not be found, this was not enough time to have them subpoenaed.

Defense counsel moved to dismiss the case against Scott and objected to a continuance because the State had not filed a motion in accordance with Hill v. Sheriff, 85 Nev. 234, 452 P.2d 918 (1969). The district court, however, responded that a "continuance is a discretionary call" and granted a continuance.

On September 9 and 16, 1993 a hearing was finally conducted. Robin S. ("Robin"), Tristain's mother, testified that she and Tristain lived in Las Vegas between December 1988 and December 1992. During that time, Scott lived in Las Vegas with his father, Chris E. ("Chris"), and step-mother, Lyndia E. ("Lyndia"). Robin knows Scott because she is engaged to Jonathan E. ("John")—Scott's uncle and Chris's brother.

Robin testified that once while at Scott's house, when Tristain was either seven or eight years of age, Robin "saw Scotty and Tristain on the top bunk. Tristain had her hands underneath him. The instant I opened the door, they'd both—like nothing happened. They both moved instantly." Before that incident, Robin noticed that Tristain engaged in "odd behavior." Robin described this behavior as "rebellious." Tristain did not want to take care of her room or take care of anything. Robin also testified that twice Tristain acted out sexually with her sister, Rebecca. They got on

top of each other like they were having sex. Tristain explained that she did this because her best friend, "Destiny," told her to.

Robin also testified that when she first moved to Las Vegas, she and John took John's daughter, Alicia, from Colorado without permission. The court in Colorado eventually compelled Robin and John to return Alicia. There is evidence in the record that Alicia's step-grandfather (i.e., Robin's father)[1] molested Alicia while she was in Las Vegas with John and Robin.

At the time of the hearing, Tristain was nine years old. Tristain testified that Scott did bad things to her beginning when she was six years of age. Tristain testified that Scott played with the spot "between [her] legs" with his finger. Tristain could not testify how often Scott touched her between the legs. Tristain testified that "three or four" times Scott pulled down his pants and showed her his "private part." In addition, Tristain testified that Scott made her touch his private part. Tristain did not tell Robin about Scott's behavior until Robin spanked Tristain for acting out sexually with Rebecca.

William B. ("William"), Scott's uncle and Lyndia's brother, testified that he lived with his wife, Lisa B. ("Lisa"), and his son, Brian B. ("Brian"), at the home of Chris, Lyndia and Scott between July 1990 and October 1990. William witnessed Tristain get on top of Brian, then two years of age, "and start humping him." Lisa testified that she also witnessed the incident where Tristain "humped" Brian. Lisa testified that when Robin reprimanded Tristain, she said that she did it because "she saw mom and dad doing it."

Scott emphatically denied that he ever did anything sexually inappropriate with Tristain. Scott also testified that there were no bunk beds in his house. A few weeks after Robin and Tristain moved to Las Vegas, Scott and his family gave them the bunk beds. In addition, Scott testified that Robin would always try to get him in trouble. Scott stated, "She'd say I said something or do something when I actually didn't." Scott was grounded seven times because of disagreements with Robin. Once Robin asked Scott to fix her kids something to eat and he responded that he was not going to do it. Robin then told Scott, "I'll have your uncle [John] beat your ass." Scott testified that everyone in the family said Robin was going to get him.

Chris testified as to many other causes of friction between his family and Robin. First, Robin was arrested at a funeral in Colorado and Chris advised Greg (another brother of Chris and John) not to bail Robin out of jail because he would lose the

---

[1]Although Robin's father is referred to as Alicia's step-grandfather, Robin and John are not actually married.

money. Second, John and Robin borrowed the car of Chris's and John's mother to get from Colorado to Nevada; and when the car broke down, John and Robin did not attempt to fix it. Third, Chris needed John to stay overnight at their mother's trailer after the trailer had been vandalized and because the back window was broken. John and Robin, however, refused to help. Because of this feuding, the families did not have any contact with each other from October 1989 to May 1991.

After the families began talking again, John and Robin asked Chris for money to pay their rent. When Chris said he did not have enough money, John and Robin "were kind of hateful" toward Chris. Subsequently, Chris did not hear from John or Robin until Detective Tina Sweeney ("Detective Sweeney") called Chris and informed him of the allegations against Scott.

In addition, Chris testified that Robin had told him in early 1989 that Tristain had been molested by either her father or father-in-law. Debra D. ("Debra"), Scott's aunt, confirmed Chris's story by testifying that in August 1991 Robin told her that Tristain had been molested. Lyndia also testified that even before Robin and Tristain moved to Las Vegas, Robin told her that Tristain had been molested by either Robin's father or father-in-law. This story may also be supported by the fact that Alicia alleged that when she was in Las Vegas she was molested by Robin's father.

The district court concluded that Scott committed the three acts of lewdness, adjudicated Scott a delinquent because he was between eleven and thirteen years of age when the acts occurred, and placed him on three years' probation. Scott appealed, arguing that the district court erred by (1) granting the State a continuance when the State had not filed a motion in accordance with *Hill;* (2) excluding the result of his first polygraph test, but admitting the result of his second polygraph test; (3) adjudicating him a delinquent when there was insufficient evidence to support his conviction; and (4) allowing Robin to remain in the courtroom during Tristain's testimony.

We conclude that Scott's first argument has merit. Because we find that the district court should not have continued Scott's hearing, it is unnecessary for us to reach Scott's remaining arguments. Accordingly, we reverse the district court's judgment and vacate Scott's adjudication as a delinquent.

## DISCUSSION

Scott first argues that because the State did not follow the proper procedure in requesting a continuance as required by *Hill,*

the case against Scott should have been dismissed. The preliminary question, however, is if the protections afforded in *Hill* extend to juvenile proceedings. We conclude that they do. In *Hill,* this court stated:

> [T]he party seeking a continuance of a preliminary examination upon the ground of the absence of witnesses must prepare and submit to the magistrate an affidavit stating: (a) the names of the absent witnesses and their present residences, if known; (b) the diligence used to procure their attendance; (c) a brief summary of the expected testimony of such witnesses and whether the same facts can be proven by other witnesses; (d) when the affiant first learned that the attendance of such witnesses could not be obtained; and (e) that the motion is made in good faith and not for delay.

*Hill,* 85 Nev. at 235-36, 452 P.2d at 919. We conclude that the reasons underlying these requirements are equally appropriate to the continuance of a proceeding in juvenile court. The granting of continuances without a showing of good cause will frustrate the judicial process. *See* Bustos v. Sheriff, 87 Nev. 622, 624, 491 P.2d 1279, 1280 (1971). In McNair v. Sheriff, 89 Nev. 434, 514 P.2d 1175 (1973), this court stated that one of the reasons underlying the *Hill* requirements is that "our criminal justice system can ill afford to bestow on prosecutors, or on defense counsel, largesse through continuances for which no cause is shown." *Id.* at 436-37, 514 P.2d at 1176.

In addition, not only do we apply the *Hill* requirements to juvenile proceedings for the pragmatic reason of judicial economy, but because a failure to do so may infringe on the due process rights of juveniles. Children standing accused in a juvenile court must be accorded due process protections. *See* In re Two Minor Children, 95 Nev. 225, 229, 592 P.2d 166, 169 (1979).

Because we conclude that the requirements enunciated in *Hill* apply to juvenile proceedings, we conclude that in the case at bar, the district court erred by not requiring the State to meet those requirements. The State's only explanation for not filing an affidavit in accordance with *Hill* was that it thought defense counsel would seek a continuance. The State admitted, however, that at least fourteen days before the hearing, it was aware that the defense did not want a continuance. The State made no effort to inform the court or the defense counsel of its willful failure to

subpoena witnesses until the day of the hearing. An oral motion the day of the hearing would have been inappropriate.[2]

In the words of Justice Cardozo,

> Every system of law has within it artificial devices which are deemed to promote . . . forms of public good. These devices take the shape of rules or standards to which the individual though he be careless or ignorant, must at his peril conform. If they were to be abandoned by the law whenever they had been disregarded by the litigant affected, there would be no sense in making them.

Benjamin N. Cardozo, *The Paradoxes of Legal Science* 68 (1928). The district court should have upheld the requirements mandated in *Hill* and therefore should have dismissed the case against Scott.

Because we find that the district court should not have continued Scott's hearing, it is unnecessary for us to reach Scott's remaining arguments.

In view of the foregoing, we conclude that Scott's appeal has merit. Accordingly, we reverse the decision of the district court and vacate Scott's adjudication as a delinquent.[3]

ROSE, J., concurs in result only.

SHEARING, C. J., concurring:

I concur separately, as it is necessary to respond to the concurrence of JUSTICE SPRINGER.

JUSTICE SPRINGER states: ''I am unwilling to sign the majority opinion because I believe that formal criminal prosecution of prepubescent children who engaged in childish sexual experimentation approaches the ridiculous.'' I quote this sentence because of its many implications with which I cannot agree and to which I must respond.

First, I do not agree that this court is in a position to dismiss the conduct as merely ''childish sexual experimentation.'' This

---

[2]In *Bustos,* this court concluded that when a party seeking a continuance does not learn until the hearing that his subpoenas were not obeyed, then he could be sworn in and orally testify that he attempted to have his witnesses appear. This procedure was allowed because the party seeking a continuance simply would not have had time to submit a written affidavit as required in *Hill. Bustos,* 87 Nev. at 624, 491 P.2d at 1280. *Bustos,* however, is inapplicable to the case at bar because the prosecutor had at least fourteen days to prepare an affidavit as required by *Hill.*

[3]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this appeal.

court heard none of the testimony. The district court, as the trier of fact, is the tribunal which has, or can have, a clear picture of what occurred. To suggest that the district court lacks the ability to discriminate between children who are expressing their natural curiosity in a harmless way, and children who are engaging in behavior that would be criminal if they were adults, is an insult. I have no dispute with the statement quoted from *California Juvenile Court Practice: Delinquent Minors* to the effect that sexual discovery and experimentation is part of the normal process of growing up and that courts should use discretion in invoking juvenile court jurisdiction. However, that discretion is lodged in the juvenile court, which hears the testimony, and not in this court which sees only a cold record.

Second, I do not agree that a six-, seven- or eight-year-old is capable of consenting to sexual acts with an eleven- or twelve-year-old. There is a major difference in power between the two. The testimony was that Scott started sexual activity when the girl was six years old and continued for two years. The disparity in the level of maturity, and especially sexual maturity, between those ages is very great. Moreover, our legislature has determined that even a fifteen-year-old is incapable of consenting to sexual activities with someone three years older for the purpose of our criminal statutes. NRS 200.364. It defies logic to suggest that a six-year-old's sexual activities with an eleven-or-twelve-year-old are consensual.

Third, the record provides no basis whatsoever for characterizing the sexual activity found here as "harmless." Even though he never heard the witnesses, JUSTICE SPRINGER does not believe that the sexual activity found by the trial judge actually occurred. One of JUSTICE SPRINGER's reasons for contesting the conclusions of the trial judge, is that there was evidence that the little girl had engaged in other simulated sexual activity with her sister and brother. The testimony was that this activity took place *after* Scott started molesting the little girl. Even though the district attorney's office used its discretion in only charging on Scott's activity after December 1990, there was evidence of earlier molestation. Instead of serving as evidence of Scott's innocence, the little girl's later simulation of sexual activity more likely indicates that she had already been indoctrinated, presumably by Scott, in sexual activity. JUSTICE SPRINGER has chosen to describe only the evidence which supports his position.

The fact that the little girl later engaged in simulated sexual activity with other smaller children belies Justice Springer's characterization of the activity as "harmless children's sexual play." The repetition of this inappropriate sexual behavior by this

victim upon others is precisely what our juvenile justice system aims to curtail.

JUSTICE SPRINGER also regards it as telling that no one else witnessed the acts to which the little girl testified. It should be apparent that forbidden sexual acts are seldom performed in public. It has long been established that one person's testimony found credible by the trier of fact can support a judgment. *See* Hutchins v. State, 110 Nev. 103, 107, 867 P.2d 1136, 1139 (1994). JUSTICE SPRINGER has no basis for disputing the finding of the trier of fact.

There are other statements in JUSTICE SPRINGER's concurrence with which I disagree. It should be apparent that juvenile court is not criminal court. Neither the purposes nor the potential consequences are the same. It is not difficult to understand the difference between a non-probational felony with a life prison sentence and an adjudication of delinquency with three years of probation during which the perpetrator is to participate in family therapy and a counseling group. Juvenile court is supposed to teach juveniles the difference between appropriate and inappropriate behavior with the hope of preventing their getting into the adult criminal system. This purpose cannot be accomplished if all sexual activity between children is dismissed as mere games or a waste of time.

I submit that this type of proceeding is a waste of time only if the perpetrator did not get the help that is needed to teach him the difference between appropriate and inappropriate sexual conduct.

SPRINGER, J., concurring:

I concur in the judgment reversing the trial court's judgment but write separately because I see a number of other reasons to reverse in addition to those stated in the majority opinion and because I think that my writing this opinion might in some way assuage the great, if unintended, harm that was inflicted by the State upon Scott E., who, if it were not for the present ruling of this court, would be tragically branded for life as a sex offender.

The State charged Scott with three sex crimes. These crimes, violations of our statutory criminal law, namely, NRS 201.230, are commonly known as "lewdness with a minor." This crime is designed to punish and deter adults from engaging in sexual activities with minors and ordinarily involves an adult offender's engaging in pederastic activities with the "intent of arousing, appealing to, or gratifying the lust passions, or sexual desires" of the molested child.[1] The charge here is that eleven-year-old Scott

---

[1] One of the incidents of the sex offender charges against Scott that brings this case to the brink of absurdity is the charge that Scott had the intent to "gratif[y] the lust" of his cousin. It is senseless, if not silly, to speak of

engaged in three lewd acts with his eight-year-old female step-cousin. One of the charges is that Scott "touched" his cousin "on top of her clothes" on her "personal spot." The other two charges are that on two occasions Scott exposed his penis and had his cousin touch his penis.

The formal charges of violation of NRS 201.230 do not state the times or places that these acts were alleged to have occurred, except that they took place "on or about/between [sic] December 1, 1990 and December 31, 1992." The "complaining witness," Scott's cousin, was unable to testify as to when these events took place, except to say that she was eight years old at the time. His cousin's mother was, however, able to narrow the event down to the "latter part of '92." It was at this time that she "caught" her daughter with Scott on the top bunk of a bed in Scott's bedroom.[2] The mother's version of the episode was that when she opened the door of an adjoining bedroom, she was able to see four children in the room, Scott, Scott's cousin (the "complaining witness") and her other daughter and son. She saw that Scott was "on his stomach" and that her daughter "had her hands underneath [Scott]." Asked to explain further, the mother testified that

---

children of his age in these terms. The intent requirement has, however, a serious aspect to it. Absent proof of Scott's "lascivious" intent to "arous[e]" the "passions" of his cousin, Scott cannot be convicted ("adjudicated," in juvenile court terms) of this sex crime. There is absolutely no evidence in this record that Scott had any such intention. I would note in passing that if he had had such an intention, he was very unsuccessful in carrying out such evil schemes in light of the girl's statement to police officers. When asked to describe Scott's penis, she replied, "I didn't really pay any attention."

In addition to there being no evidence of Scott's lascivious intentions to gratify his cousin's "lust," there is a complete failure on the part of the State to rebut the presumption of Scott's incapacity as a minor to commit these sex crimes. Winnerford Frank H. v. State, 112 Nev. 520, 915 P.2d 291 (1996).

If the State is going to bring criminal charges against pre-adolescent children charged with engaging in consensual sex games, it should at least attempt to prove the essential elements of the crime. Great mischief was done by making this into a criminal case; and, in my opinion, it was irresponsible for the prosecution not to attempt to prove these essential elements of the crime.

[2]Several witnesses testified that there were no bunk beds in the house during the "latter part of '92," but for the purposes of this concurring opinion, I will accept the testimony of Scott's cousin's mother that she observed Scott and her daughter on the top bunk with her daughter's hand on Scott's "lower abdomen area." I would note that this record is filled throughout with evidence of domestic dispute and that one of the theories of the defense was that the charges were made by vindictive parents in order to hurt Scott and his family. I mention this not with any mind to "re-try" the case, but this fact does explain such things as the conflict between the mother's story and the story of her daughter and to explain the fact that Scott passed a lie detector test on the charges made against him.

her daughter's hand was "down in the lower half" of Scott's body. Pressed further, she described the position of her daughter's hand as being on Scott's "lower abdomen." According to the mother, when the children saw her, they "acted surprised" and her daughter's "hand came out from under Scotty."

Scott's cousin saw the event as happening in a manner different from that testified to by the mother.[3] Scott's cousin does not mention that her brother and sister were in the room; and she claims that it was Scott that put his hand on her rather than that it was she who touched Scott. Scott's cousin makes it very clear that, at most, Scott touched her on her "personal spot" "on top of her clothes."[4]

The mother did not witness any event relating to Scott's supposed exposing himself to his cousin. The questioning of the girl at trial does not give any time that these events took place but does show that she believed that one event took place before the "touching" episode and one took place afterwards. The girl testified that one exposure took place in the kitchen, the other in a bedroom.

Let me assume, for the purposes of this concurring opinion, that Scott's cousin is telling the truth and that he touched her "between the legs" rather than that she was the one who touched him, on his "lower abdomen." Let me also assume (lie-detector results aside) that Scott exposed himself in front of his cousin. I ask rhetorically: Is this really the kind of case that calls for the filing of formal criminal charges against this little boy relating to the commission of sex crimes? What good can possibly come out of forcing these two young children to testify against each other and to testify formally in a court of law concerning childish sex

---

[3]The record in this case gives me reason to believe that this child was told by someone that her testimony and the resultant adjudication of Scott's commission of sex crimes would be beneficial to Scott because it would then permit Scott to get the "help" he needed.

It was argued by Scott's counsel that when the girl was being examined about whether she knew the consequences of not telling the truth in Scott's trial, she responded by saying that "Scott would get help." This is pretty scary to me.

[4]The formal charges accuse Scott of "touching" his cousin's "vagina." It is clear from the girl's testimony that she does not accuse Scott of touching her vagina but, rather, that he touched her "between the legs" and "on top of her clothes." I, of course, make no judgment as to whether the testimony of the mother or her daughter is correct and whether Scott touched his cousin or his cousin touched Scott. In this connection, I do not find it out of place to note that Scott passed two lie-detector tests. The polygraph examiner asked Scott "Did you ever touch [his cousin's] vagina?" and "Has [the girl] ever touched your penis?". He answered "No" to each of these questions. The examiner explained that "to pass, a score of +5 is needed. Scott scored +9. It is the opinion of this examiner that Scott is telling the truth."

games? Why make Scotty into an adjudicated sex criminal even if these charges had been true?[5] The answer to these questions lies, of course, in prosecutorial discretion. If formal charges were to be prosecuted because of sexual activities that are charged here, it

---

[5]I suppose in today's world, where children are often unsupervised and where explicit sex is a matter of common fare on our television sets, that cases could arise in which an eleven year old might properly be subjected to criminal charges of being "lewd" with another child. For example, if Scott's cousin had not been a sexually active eight year old and had, instead, been, say, five or six years old, I might be able to see some justification for bringing criminal charges in a case of exposure and consensual, "on top-of-clothes" touching, even though I think civil proceedings would in almost all cases like this one best serve the interests of prepubescent children involved in sexual exposure and the kind of sexual experimentation that was charged in the present case. A publication of the California Continuing Education of the Bar, *California Juvenile Court Practice: Delinquent Minors,* discusses the legal problems associated with young children's "playing doctor" and other sexually-oriented children's games such as the one that may have been involved here. I quote at some length from the text:

> Courts and practitioners should bear in mind that the juvenile court exists primarily to intervene in children's lives when necessary to protect the public and to satisfy the minor's rehabilitative needs. Although a discussion of youthful sexuality is far beyond the scope of this work, it is generally conceded that a certain amount of sexual discovery and experimentation is part of the normal process of growing up. The adults involved in juvenile proceedings should be sensitive to this and the fact that such cases, by their nature, involve very young children who might be easily damaged. There are limitations to both what the juvenile court process is intended to do and what it can do. The *Paul C.* [In re Paul C., 221 CA3d 43, 270 CR 369 (1990)] court's call for restraint and the use of judgment reflects the proper approach to the initiation of quasi-criminal legal actions in this area.
>
> There are two better approaches to use if the sexual conduct between like-aged minors is clearly consensual. First, although that conduct might constitute a technical violation of [the California Penal Code], it may not be the type of conduct that warrants the exercise of the juvenile court's jurisdiction. Instead, application of the supervision programs of Welf & I C §654 [informal probationary supervision without court intervention or adjudication] or §725(a) [court-approved informal probation, without formal delinquency adjudication], or dismissal of the petition under Welf & I C §782 might be warranted if the action is actually filed. Standards 2.2 and 3.3 of the ABA Juvenile Standards . . . may provide authority to support the court's refusal to impose [delinquency] wardship in this situation.
>
> Second, experience shows that these types of charges are most often filed against boys, and filing a motion to dismiss for discriminatory prosecution with the attendant discovery proceedings (see *Murgia v Municipal Court* (1975) 15 C3d 286, 124 CR 204), might resolve the issue.

Henry J. Hall, I *California Juvenile Court Practice: Delinquent Minors* 3-4 (February 1995 update).

The quoted text is an appeal to common sense and reason. It is simply not necessary to adjudicate sexual experimentation of prepubescent children as a crime, even when the crime is euphemistically called "delinquency."

would seem to me that, at worst, some kind of civil petition might have been filed rather than the filing of criminal charges. If either Scott or his cousin were in need of some kind of juvenile court services by reason of supposed sexual aberrations (which seems clearly not to be the case), then some kind of child protection proceedings might have been justified, but not sex offender charges against one of the participants only.[6]

I file this concurring opinion in the hope that it might prevent some other young child from suffering the indignity, embarrassment and shame that was unnecessarily suffered by Scott in the present case. This is truly a no-win case. At its worst, Scott would have been permanently and totally unjustifiably branded as a sex offender. At best, Scott *and* his cousin would have to have undergone the trauma of participating in a formal criminal trial in which cousin was pitted against cousin and in which no outcome could have been of the slightest benefit to either one of them. The heedless filing of criminal sex offender charges has resulted in great and probably irreparable harm to Scott and in all likelihood to his cousin too. I truly hope that we will not be seeing any more of the kind of uncalled-for damage to children and the kind of waste of legal and judicial resources that is so undeniably present in this case.

---

[6]It is clear from the record that Scott's cousin had some very serious sexual problems that dated back to far before the "latter part of 1992." The girl's own mother traces her daughter's precocious and habitual sexual preoccupation to age six. The mother testified that she noticed these activities "[a]bout two years . . .[t]wo and a half years maybe" before the time of trial. This would relate to a period between March 1991 and September 1991, when the little girl was only six years old. The mother testified that she found her daughters, one on top of the other, "doing what a man and a woman would normally do in their own bedroom or in a motel room or something. She "caught them twice." Scott's cousin, at trial, admitted to having in the past engaged in sexual activities with a girl named Destiny and with Destiny's brother, in which one or another of the children would be "on top of her with your pants down." Two other witnesses observed some rather troubling sexual activity by this girl. When she was "[p]robably four, four and a half," she was seen to "g[e]t on top of Brian and started humping on him." Brian was the witness's son and was "[p]robably two and a half" at the time. I relate this child's sexual history not because it portrays the likelihood that the mother's version of her daughter's touching Scott's lower abdomen is more likely the case than her daughter's conflicting version, but to suggest that if formal proceedings (civil not criminal) were to be brought in this case, perhaps this little girl is a more suitable subject for a juvenile court petition than the little boy.