KIMBLE McNAIR, II, M.D., Appellant, v. THE STATE OF NEVADA, Respondent.

No. 20127

January 24, 1992                    825 P.2d 571

[Rehearing denied May 27, 1992]

*William H. Smith* and *Annette R. Quintana,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *John P. Lukens,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant, Kimble McNair, a licensed physician specializing in obstetrics and gynecology, was convicted of six counts of sexual assault and sentenced to four consecutive and two concurrent life sentences. His victims were also his patients. McNair raises several issues on appeal, but most insistently contends that the evidence does not support a finding of lack of consent, an element essential to his convictions. Our review indicates that McNair was fairly tried and convicted. We therefore affirm.

## The Facts

McNair, a graduate of Stanford University School of Medicine, was a solo practitioner in obstetrics and gynecology. Each of the assaults at issue occurred in McNair's medical offices during a period extending from 1984 through 1988 and were strikingly similar in the methods by which they were accomplished. The patients-victims testified that they were assaulted during the routine course of medical examinations conducted in McNair's examining room. The victims testified that McNair asked them to bend over a chair, or to squat in front of him, or he would bend them over by exerting pressure on the small of their backs. Unfortunately, the trusting patients discovered that they had unwittingly positioned themselves for an anal penile penetration by their physician.[1] The patients testified that McNair inserted his penis, or his finger and then his penis, into their recta while they were in the orchestrated positions of vulnerability.[2]

A more detailed review of the facts surrounding the victim who triggered McNair's arrest is helpful to our legal analysis. On January 2, 1988, McNair completed a gynecological examination of Elizabeth, which included a breast, pelvic and rectal examination. During the latter exam, McNair wore a glove and used a lubricant. Elizabeth was dressed in a hospital-type gown open in the back. She had asked for this particular appointment and examination after noticing a dark discharge from her breast. McNair had been her trusted, treating gynecologist for well over a year. After this examination, she was relieved to find out that there was probably nothing seriously wrong. Impulsively, Elizabeth asked to hug her doctor. According to Elizabeth's testimony, McNair suggested that he check her again "to see if I hurt you." He thereafter put on another glove, and proceeded to move his finger in and out of her rectum. McNair then moved her to an examining table, positioned her over the table, inserted his penis into her anus, and ejaculated. Elizabeth did not push him away.

Immediately after leaving McNair's offices, Elizabeth called her therapist. After some reluctance, and repeated showers and baths, Elizabeth went to a rape crisis center and a hospital emergency room. The physical examination revealed no trauma. After further prodding, Elizabeth reported the assaults to the Las Vegas Metropolitan Police Department. The police fitted her with

---

[1] The patients testified that McNair's nurse, a defense witness, left the examination room shortly after McNair had ostensibly concluded his examination. The assaults took place in the one examining room which had a windowless door. McNair's wife also worked regularly in his front office and supervised his office records.

[2] Eight of McNair's patients testified at trial. McNair was acquitted of five counts concerning four of the patients. One count was dismissed.

a body wire for her next visit to McNair's offices. During this visit, Elizabeth repeatedly confronted McNair about the assault. The record reveals that he insisted to her that nothing like this had happened before and that he was a happily married man of sixteen years. The record also reveals that McNair apparently sought to soften Elizabeth's antagonism toward him by emotionally suggesting that he was suicidal over the incident.[3]

After McNair's arrest, other patients and victims voluntarily came forward to the police. Elizabeth was the only victim involved in the instant appeal who reported McNair's criminal conduct contemporaneously to law enforcement authorities. Two victims reported McNair's crimes to their therapists, who corroborated the victims' testimony at trial.

### *Legal Discussion*

The standard of review in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984). The established rule is that it is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of witnesses. Walker v. State, 91 Nev. 724, 726, 542 P.2d 438, 438-39 (1975). In a criminal case, a verdict supported by substantial evidence will not be disturbed by a reviewing court. Nix v. State, 91 Nev. 613, 614, 541 P.2d 1, 2 (1975); Sanders v. State, 90 Nev. 433, 434, 529 P.2d 206, 207 (1974).

The primary issue raised on appeal is whether the State met its requisite burden of proving *that the sexual acts occurred without the consent of the victims.* NRS 200.366.[4] McNair insists that where the victim is capable of understanding or resisting the sexual advances, there must be a demonstrable objective manifestation of protest which is reasonable under the circumstances. Our legal inquiry into the issue of nonconsent, an essential

---

[3] An enhanced audio tape of the entire conversation between Elizabeth and McNair was played to the jury.

[4] NRS 200.366(1) provides as follows:

A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the victim's will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.

element of sexual assault, encompasses two aspects: (1) whether the circumstances surrounding the incidents indicate that the victims had reasonably demonstrated their lack of consent and (2) whether it was reasonable from the point of view of the perpetrator to conclude that the victims had manifested consent.

We initially note that Nevada's statute does not explicitly require the use of overt force as an element of sexual assault. Physical force is not a necessary element in the commission of the crime of rape. Dinkens v. State, 92 Nev. 74, 77, 546 P.2d 228, 230 (1976).[5] Our statute only requires the commission of the act of sexual penetration against the will of the victim. Id.

A rape victim is not required to do more than her age, strength, and the surrounding facts and attending circumstances would reasonably dictate as a manifestation of her opposition. Id. at 78, 546 P.2d at 230. In other words, whether the victim manifested opposition or did in fact consent, depends on the facts of the particular case.

Submission is not the equivalent of consent. Tryon v. State, 567 P.2d 290, 293 (Wyo. 1977). While consent inevitably involves submission, submission does not inevitably involve consent. Id. Lack of protest by a victim is simply one among the totality of circumstances to be considered by the trier of fact. See State v. Thomas, 510 P.2d 1137, 1139 (Wash.Ct.App. 1973).

The record in the instant case reveals that in almost every instance the victims had no opportunity to voice their consent or objection to McNair's assaults. When a physician succeeds in the penile penetration of a patient under the guise of performing a medical examination, a sexual assault is committed by fraud and deceit and without the victim's consent. See R. Perkins & R.

---

[5]The concept that a woman consents unless she resists to the limits of her strength was discarded long ago. See State v. Thomas, 510 P.2d 1137, 1140 (Wash.Ct.App. 1973); see also People v. Bermudez, 157 Cal.App.3d 619-625 (Cal.Ct.App. 1984) (the legislature has shifted the statutory focus from the quality of physical resistance to the overbearing of the victim's will). The law has good reason to require proof of physical force or threats of bodily injury in ambiguous circumstances arising between acquaintances whose intentions can be misinterpreted. Bermudez, 157 Cal.App.3d at 622. However, "a criminal invasion of sexual privacy does not become a nonrape merely because the victim is too fearful or hesitant to say something to the effect that 'I guess you know I don't want you to do this.' " Id.

Boyce, *Criminal Law* 1080 (3rd ed. 1982). "In such cases the unlawful intercourse is rape for the very sufficient reason that it was without the woman's consent. 'She consented to one thing, he did another materially different . . . .' " *Id.* (quoting The Queen v. Flattery, 2 Q.B.D. 410, 413 (1887)). *Accord,* 3 C. Torcia, *Wharton's Criminal Law* § 290 (14th ed. 1980). *See, e.g.,* Annot., *Conviction of Rape or Related Sexual Offenses on Basis of Intercourse Accomplished Under the Pretext of, or in the Course of, Medical Treatment,* 65 A.L.R.4th 1064 (1988 & Supp. 1990).

We note approvingly that one court has persuasively stated that when a doctor has obtained sexual intercourse by means of fraud, legally recognized consent is negated:

> It would indeed be a reproach upon our statute if a physician, under the pretense that it was necessary for a woman patient to submit to examination of her sexual organs in order to assist him in the diagnosis of her ailment, and under the pretense that it was necessary for her to expose her person and to assume a position which, at the same time, incidently afforded ready opportunity for sexual attack, could safely take advantage of her position and make an unexpected and uninvited sexual invasion of her person. If, under such circumstances, a physician takes such an unconscionable advantage of the woman's position, and, to her complete surprise, and without the slightest ground to assume that he has her consent, violates the trust and confidence imposed in him and perverts her position and his opportunity into an uninvited and cowardly attempt to gratify his lust, the force merely incident to penetration should be deemed sufficient force within the meaning of our rape statute.

People v. Borak, 301 N.E.2d 1, 4 (Ill.App.Ct. 1973) (quoting State v. Atkins, 292 S.W. 422, 426 (Mo. 1926)).

We hold that sufficient evidence of sexual penetration against the victim's will exists under Nevada's statute when the penetration is accomplished under a pretext of medical treatment and without the victim's foreknowledge or consent. *Id.* at 5. Moreover, penetration occurs against the victim's will or without her consent when, for any reason, the victim is not in a position to exercise an independent judgment concerning the act of sexual penetration.[6] Wilson v. State, 655 P.2d 1246, 1258 (Wyo. 1982).

---

[6]We note further that mere gestures of affection should not be construed as invitations to an assault. A useful analysis is found in State v. Myers, 606

At oral argument, McNair contended vigorously that to find consent under the circumstances would amount to judicial legislation. We disagree. The language of our statute is sufficiently broad and explicit to encompass conduct involving an act of sexual penetration occurring as a result of fraud and deceit in the course of a medical examination and without the consent of the patient. The statute's reference to victims "incapable of resisting or understanding the nature of . . . [the perpetrator's] conduct"[7] is also applicable to the conduct occurring here, where the trusting patients were unable to resist because the sexual penetration was initiated by subterfuge and without the foreknowledge of the victims.

Moreover, under the totality of the circumstances present in McNair's case, it was unreasonable for the trusted physician to believe that his patients had in fact consented to his sudden sexual invasions. To the contrary, the record substantially reflects that McNair abused his professional status and trust during medical examinations that were staged to exploit his unsuspecting and vulnerable patients and gratify his personal sexual desires. The record reveals that McNair's conduct was both repetitive and predatory.

As a gynecologist, McNair held a position of trust and respect reserved for members of the medical community. His patients came to his office on the premise that they would receive ethical, professional medical treatment for their ailments. These competent adult patients approached their medical appointments in a compliant attitude of cooperation in order to receive effective medical attention. They disrobed in good faith as patients, not as their trusted physician's objects of sexual gratification. They followed the directions of their physician in positioning their bodies for examination. In good faith they allowed themselves to be alone with their doctor in an examining room. Their testimony is that of victims criminally betrayed by McNair as he misused his professional status and trust to place his patients in situations where they became his vulnerable and unsuspecting prey. Any belief by McNair that his patients consented to his sexual behavior by not instantly resisting, would be, on this record, patently

---

P.2d 250 (Utah 1980). The law does not justify a conclusion that "if a woman is 'friendly' in accepting the proffered hospitality of a man for food and drink, and engages in 'necking,' . . . and that this persists over a period of time, she loses her right to protest against further advances the man may decide to force upon her; and thereby subjects herself to such advances and should be deemed to consent to intercourse if he, but not she, so desires." *Id.* at 252.

[7]See footnote 4.

unreasonable. *See* Scadden v. State, 732 P.2d 1036, 1043 (Wyo. 1987) (a person of ordinary sensibilities when occupying a position of authority clearly should have known that his conduct was forbidden).

Experts for the State testified that patients become intensely confused when they are sexually assaulted by a trusted health care professional. Ann Burgess, professor of psychiatric mental health nursing at the University of Pennsylvania School of Nursing in Philadelphia, described the type of assault at issue as "the confidence style assault." Victims experience feelings of betrayal and confusion which take a considerable time "to sort out." According to the witness, one of the characteristics of an assault of this nature is delayed reporting.[8]

McNair testified extensively in his own defense. His insistence that Elizabeth had seduced and aggressively pursued him was diametrically opposed to her own sworn testimony on the witness stand. The demeanor and credibility of the complaining witnesses and McNair was pivotal to the proceedings below.

Whether McNair's sexual advances occurred with the consent of his complaining patients presented questions of fact for the jury to decide from all the evidence it had a right to consider.[9] *See Thomas*, 510 P.2d at 1139. Under certain circumstances, a lack of protest may properly be viewed as evidence of consent. In this

[8]*See* A. W. Burgess & C. Hartman, *Sexual Exploitation of Patients by Health Professionals* (1986). Victims of sexual exploitation by a health professional will turn for help to professionals in psychiatry, social services and the law. *Id.* at 43. Often, "the inaction of individuals with knowledge of the exploitation allowed the offending health professionals to continue their abusive behaviors at the expense of additional victims." *Id.* Delayed reporting is a problem endemic to the crime of sexual assault. It is possible if not probable that the prestige of McNair's position contributed to the victim's delay in reporting the sexual assaults. One seventeen-year-old victim testified to the disbelief of one of her parents who thought she must have "misunderstood something." The parent returned her to NcNair's care, accompanied by a sibling.

[9]Only one victim had advance notice of appellant's predatory urges. After an initial assault, the victim returned to McNair in order to secure a promised letter concerning her physical health which she needed in order to seek reemployment with an employer which had recently terminated her. Assaulted a second time, she did not push McNair away. She testified to being in great disarray at the time due to the influence of narcotics. The first sexual assault by McNair had further entrenched her addiction. She testified that her reaction at the time of the first assault was not to immediately report the assault to police but to attempt to obliterate the effect of the sexual assault with an increased ingestion of cocaine. On the issue of lack of consent, it was for the jury to determine the weight and credibility of such testimony. *See* Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); Hankins v. State, 91 Nev. 477, 477, 538 P.2d 167, 168 (1975).

case, the jury decided from all the surrounding circumstances that the victims' lack of protest was not evidence of consent. A sharp conflict in the evidence confronted the jury, and it was within the jury's province to resolve the evidence against the physician. *See* People v. Ogunmola, 193 Cal.App.3d 274, 281 (Cal.Ct.App. 1987) (the jury or judge may resolve conflicting testimonial evidence that an obstetrician/gynecologist raped two patients although the physician claimed that the configuration of the examining room made such events highly unlikely); Story v. State, 721 P.2d 1020, 1026 (Wyo.), *cert. denied,* 479 U.S. 962 (1986) (it was the function of the jury to resolve a testimonial dispute as to whether a patient had been sexually assaulted in the course of medical examination); People v. Minkowski, 204 Cal.App.2d 832, 843 (Cal.Dist.Ct.App. 1962) (adverse inferences could be drawn from evidence of the circumstances and methodology of the medical examination and the unusual behavior of the doctor).

Persuasive corroborative evidence supports McNair's convictions. The victims did not know each other. Yet they testified to similar sexual assaults accomplished under the guise of medical examination at McNair's private offices and under similar circumstances. Circumstantial evidence alone may sustain a conviction. Deveroux v. State, 96 Nev. 388, 391, 610 P.2d 722, 724 (1980); Crawford v. State, 92 Nev. 456, 457, 552 P.2d 1378, 1379 (1976). The assaults all took place in the course of the physician-patient relationship. The jury was free to determine that McNair had used the physician-patient relationship to find his victims and to satisfy his predatory sexual desires. Our review of the record reveals substantial evidence in support of the jury's verdicts.[10] *See* Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981).

McNair also contends that he was prejudiced by a constitutionally prohibited exercise of a racially biased peremptory challenge by the prosecutor during the selection of the trial jury. Under Batson v. Kentucky, 476 U.S. 79 (1986), a prosecutor may not purposefully discriminate on the basis of race in the selection of the petit jury. *Id.* at 96-97. Here, the prosecutor peremptorily removed one black juror and voiced no objection to the seating of

---

[10]McNair also contends that his actions are simply of ethical concern suitable for resolution by the medical society. Those who commit criminal acts risk criminal prosecution as a protective measure against further injury to the public. Although some of the same concerns may overlap, professional disciplinary procedures have a different purpose and are chiefly concerned with maintaining the integrity and standards of the profession.

another. The prosecutor challenged the one black juror because he had a direct connection with McNair's wife through her church activity. After careful review, we are persuaded that the prosecutor offered facially neutral, nonpretextual reasons for the challenge. McNair did not establish a prima facie *Batson* violation requiring an evidentiary hearing. *See* Clem v. State, 104 Nev. 351, 355, 760 P.2d 103, 105 (1988), *overruled on other grounds,* 106 Nev. 571, 798 P.2d 548 (1990).

McNair also claims that the trial court erred in failing to replace a juror who, during the jury's deliberations, suddenly remembered that her biological mother had been sexually molested. The record indicates that the juror had lived with her father from the age of nine; that the incident occurred thirty-seven years previously; that the juror had not discussed the incident in ten years; that the juror had never been apprised of the details; and that the deliberating jury simply noted the fact in passing and did not improperly dwell upon this extraneous matter. We conclude that the jury's verdict was not improperly influenced under the circumstances. *See* Hale v. Riverboat Casino, Inc., 100 Nev. 299, 305, 628 P.2d 190, 193 (1984).

Next, McNair contends that he was denied due process by a biased and hostile judge. We have said that a "trial judge must not only be totally indifferent as between the parties, but he must also give the appearance of being so." Kinna v. State, 84 Nev. 643, 647, 447 P.2d 32, 35 (1968). However, it has also been recognized that few trials are totally devoid of inadvertent remarks or actions by a trial judge which may seem inappropriate "when later examined in the calm cloisters of the appellate court." United States v. Polizzi, 500 F.2d 856, 892 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120 (1975). The question is whether the trial umpire's misadventures are so pervasive and of such a magnitude that the trial ambiance is discernibly unfair to the defendant when viewed from the cold record on appeal. *Id.*

At oral argument, the state noted that McNair's counsel attempted to bait the judge, a fact also noted in the record by the trial judge himself. The state also apprised this court of the use by defense counsel of assertedly disrespectful body language toward the district court judge. The record indicates, in addition, that McNair's counsel reacted to adverse rulings from the bench by

the use of profanity *sotto voce*.[11] Such courtroom comportment can never be fully captured by the record.[12]

We note with commendation and approval, that following one incident in regard to McNair's counsel, the trial judge apologized to the jury for his "outburst" and properly cautioned the jury. The jury was properly instructed in its duty to follow the law and the instructions as provided by the court.

The interaction between litigants, counsel and the district court judge should be properly viewed against the entire trial background, in this case a lengthy and trying six weeks, rather than the myopic perspective afforded by isolated incidents.[13] It appears conclusively from the record that McNair was given full ventilation of his defense at trial. We are persuaded that the friction displayed during the trial did not create an impression of judicial bias prejudicial to McNair's defense. The record reflects that the departures from strict judicial impartiality were brief episodes within the context of the entire trial. *See* United States v. Nazzaro, 472 F.2d 302, 312-313 (2nd Cir. 1973).

We have fully examined the remaining issues raised by McNair and conclude that they are without merit. For the reasons stated above, we affirm the convictions and sentences entered by the district court.

---

[11]As one court observed "[t]he human tendency to blame a trial judge for the jury's verdict of guilt is a frailty we often encounter . . . ." United States v. Nazzaro, 472 F.2d 302, 303 (2d Cir. 1973).

[12]If the representations concerning defense counsel's trial behavior are accurate, the trial judge should unhesitatingly report such behavior to the appropriate bar discipline board for investigation and possible imposition of discipline. This court does not condone disrespectful courtroom conduct by lawyers licensed to practice in Nevada courts.

[13]When McNair's counsel tediously questioned Elizabeth about the type and color of her automobile, the trial judge asked to see counsel in chambers. The record indicates that the trial judge had strong concerns over the slow pace of the trial, and warned counsel that the jury was falling asleep. After repeated warnings to appellant's counsel about the improper use of leading questions, the court imposed fines which were subsequently lifted.