131 Nev., Advance Opinion 27

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

| | |
|---|---|
| MIGUEL JOSE GUITRON,<br>Appellant,<br>vs.<br>THE STATE OF NEVADA,<br>Respondent. | No. 64215 |

**FILED**

MAY 2 1 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a conviction by a jury of incest, four counts of sexual assault with a minor under the age of 14, and two counts of lewdness with a minor under the age of 14. Eighth Judicial District Court, Clark County; Kathleen E. Delaney, Judge.

*Affirmed.*

Phillip J. Kohn, Public Defender, and Amy A. Feliciano and Kedric A. Bassett, Deputy Public Defenders, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Steven S. Owens, Chief Deputy District Attorney, and Elissa Luzaich, Deputy District Attorney, Clark County,
for Respondent.

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

*OPINION*

By the Court, SILVER, J.:

In this appeal, we consider whether evidence presented at trial was sufficient to support a jury verdict finding appellant Miguel

10/8/15: Corrected per letter to publishers. CJ

15-900549

Guitron guilty of incest and sexual assault with a minor under the age of 14. Additionally, we must determine whether the district court erred by denying Guitron's motion to admit evidence of the victim's prior sexual knowledge, and clarify the procedure for the admission of such evidence. We also consider whether the district court erred by refusing to give Guitron's proposed inverse instruction and denying Guitron's *Batson* challenges. Although we conclude the district court erred in denying the motion to admit evidence and in failing to give the proposed instruction, these errors were harmless. Accordingly, we affirm.

## FACTS

Guitron met the victim's mother, Anita, in Las Vegas in 1997 or 1998. The couple dated for some time, after which Anita moved to Michigan. When she left Las Vegas, Anita was approximately two to three months pregnant with the victim, who she asserts is Guitron's child. However, Anita did not tell Guitron she was pregnant and she had no contact with Guitron for some years after leaving Las Vegas. When the victim was five years old, Anita applied for child support from Guitron, which the court awarded following a positive paternity test.

In October 2010, Guitron called Anita while she was living in Ohio with the victim and her two other children fathered by another man. The victim, who was then 11 years old, overheard the conversation, realized it was her father on the phone, and asked to speak with him. The victim testified that during this first telephone conversation, Guitron told her he was her father. Anita described the victim as "a kid in a candy store" upon speaking with her father for the first time.

Following this phone call, Anita moved back to Las Vegas in late 2010 and resumed her relationship with Guitron. The victim, who was in elementary school and enrolled in an Individualized Education

Plan because she was a slow learner, was thrilled to finally meet her father. Guitron began living with the family shortly after the move. During this time, the victim discussed sex with Anita and had at least some knowledge and understanding of sex.

When the victim was 12 years old, Anita realized the victim was pregnant. Initially, the victim told Anita a neighbor boy was the father. The next day, Anita took the victim to a pregnancy center where medical personnel confirmed she was eight months pregnant. Based on the victim's statements during the examination, the medical staff called the police and alleged Guitron had sexually assaulted the victim. The victim then admitted to both Anita and the police that Guitron was the baby's father. She explained she initially lied because Guitron told her to say the neighbor boy was the father. DNA testing by the Las Vegas Metropolitan Police Department conclusively proved Guitron was the father of the victim's baby. Additionally, Guitron sent letters to the victim during the pendency of the case, openly admitting he was the baby's father.

At trial, based on his statement during an interview to detectives prior to his arrest, Guitron asserted he and the victim only engaged in sex on one occasion. Further, he alleged the victim initiated that single sexual encounter, which occurred while Guitron was intoxicated and partially unconscious. Guitron argued the victim was sexually curious and wanted to have sex with him, and she was capable of understanding the consequences of her actions despite her age. He also asserted the State did not meet its burden of proof on the incest charge because the State did not present DNA evidence proving he was the victim's father. The State countered with evidence Guitron had groomed

the victim and engaged in sexual conduct with her on multiple occasions, even when the victim resisted his advances. The State also presented witness testimony that Guitron was the victim's father.

The jury convicted Guitron of incest, four counts of sexual assault with a minor under the age of 14, and two counts of lewdness with a child under the age of 14. Guitron appeals.

## DISCUSSION

On appeal, Guitron contends (1) the State presented insufficient evidence for the jury to convict him of incest and sexual assault with a minor under the age of 14; (2) the district court erred by denying Guitron's motion to admit evidence of the victim's prior sexual knowledge; (3) the district court erred by refusing to give Guitron's proposed inverse instruction; and (4) the district court erred by denying Guitron's *Batson* challenges.

### Sufficiency of evidence

Guitron contends the State presented insufficient evidence for the jury to convict him of incest and sexual assault with a minor under the age of 14. We disagree.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted); *Mitchell v. State*, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). As "it is the function of the jury, not the appellate court, to weigh the evidence and pass upon the credibility of the witness," *Walker v. State*, 91 Nev. 724, 726, 542 P.2d 438, 439 (1975), we do not determine the defendant's guilt, but rather consider "whether the jury, acting reasonably, could have been convinced [beyond a

reasonable doubt] by the evidence it had a right to consider," *Wilkins v. State*, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980). The jury determines the weight and credibility of conflicting testimony, and we will not disturb the jury's verdict where substantial evidence supports the jury's findings. *See Shannon v. State*, 105 Nev. 782, 791, 783 P.2d 942, 947 (1989); *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); *see also McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

*Incest*

NRS 201.180 defines incest as occurring when "[p]ersons being within the degree of consanguinity within which marriages are declared by law to be incestuous and void [either] intermarry with each other or . . . commit fornication or adultery with each other." A parent and natural child are within the degree of consanguinity wherein a marriage between the two would be declared by law incestuous and void. *See* NRS 122.020(1), *held unconstitutional on other grounds by Latta v. Otter*, 771 F.3d 456, 476-77 (9th Cir. 2014). Further, fornication is defined as sexual intercourse between two unmarried people. *Douglas v. State*, 130 Nev. ___, ___, 327 P.3d 492, 494 (2014).

On appeal, Guitron argues his conviction for incest is not supported by the evidence, solely because the State failed to present DNA evidence conclusively proving he is the father of the victim.

Although neither party raises NRS 51.265, that statute provides:

> Reputation among members of a person's family by blood or marriage, or among his or her associates, or in the community, is not inadmissible under the hearsay rule if it concerns his or her birth, marriage, divorce, death, legitimacy, relationship by blood or marriage,

COURT OF APPEALS
OF
NEVADA

(O) 1947B

5

ancestry or other similar fact of his or her personal or family history.

Here, both the victim and her mother, Anita, testified Guitron was the victim's father. The victim testified that the first time she spoke with Guitron by telephone he identified himself as her father. Anita testified she was pregnant by Guitron when she broke up with him and moved from Las Vegas. Further, Guitron paid child support for the victim after paternity tests concluded he was the father of the victim. Thus, the jury heard testimony from both the victim and Anita that Guitron was the victim's father. Therefore, under NRS 51.265, the jury could reasonably conclude from the evidence presented, Guitron was the victim's father.

Additionally, evidence presented at trial demonstrates that Guitron himself admitted numerous times he was the biological father of the victim. NRS 51.035(3)(a) provides a party's own statement offered against him is not hearsay and is admissible against him. Here, Guitron admitted to detectives that DNA testing confirmed his paternity in prior child support proceedings and he repeatedly told detectives the victim was his biological child. Thus, Guitron's numerous admissions to detectives are admissible evidence sufficient to prove paternity beyond a reasonable doubt, despite the State's lack of DNA evidence of paternity to the jury.

Furthermore, although not addressed by either party, NRS 51.345(1) excepts from the hearsay rule statements that, at the time they are made, would subject the declarant to criminal liability or social disapproval, and that a reasonable person in the position of the declarant would not have made unless he believed it to be true. At trial, the State presented letters written by Guitron to the victim. In those letters, Guitron told the victim "you are my beautiful daughter" and "I love you," and instructed the victim to remember "we had [a] talk in the backyard

about the fact about [C.G.] being your sister and your daughter and my daughter, too. Remember me and you said that's going to be weird like on Jerry Springer show. But me and you got a daughter together." This final line was followed by a drawing of three pink hearts. Guitron further told the victim he was "sorry," stating "I will be back. I can't wait till I can see you and the baby. . . . [C.G.] is my daughter and I need to see her."

Thus, in addition to the DNA evidence showing conclusively Guitron was the baby's father, Guitron wrote several letters to the victim asserting she was his daughter and the victim's baby was also his child. As this open admission of incest would (and did) subject Guitron to both criminal liability and social disapproval, and because Guitron did not argue he did not believe the statements to be true, these letters were likewise admissible evidence upon which the jury may have based its verdict. Thus, based on Guitron's own statements, the jury could reasonably infer he was the biological father of the victim.

Accordingly, because ample evidence reflects Guitron is the father of both the victim and her baby, we affirm the incest conviction.

*Sexual assault with a minor under the age of 14*

We next turn to the question of whether the evidence supported the jury's verdict finding Guitron guilty of sexual assault with a minor under the age of 14. As relevant to this appeal, NRS 200.366 defines sexual assault as occurring where a person "subjects another person to sexual penetration . . . against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his or her conduct." Guitron argues he should not have been convicted on this charge because the evidence showed the victim consented to having sex, and did not support the jury's finding Guitron knew or

Court of Appeals
of
Nevada

(O) 1947B

should have known the victim did not understand the consequences of her conduct.

At trial, Guitron did not dispute he and the victim had sexual intercourse or the victim's baby was his child. Instead, Guitron asserted he had committed a lesser crime of statutory sexual seduction. The victim testified at trial that she was in love with Guitron and Guitron was in love with her. Guitron's counsel argued to the jury the victim initiated sex by climbing on top of him while he was intoxicated because she was curious about sex and wanted to know what a penis felt like inside of her vagina.

The State, however, countered that this victim was vulnerable and unable to understand the consequences of her actions. Further, because of the victim's age and vulnerability, Guitron intentionally manipulated the victim into having sex with him. The State presented evidence the victim was "like a kid in a candy store" the first time she spoke with Guitron on the telephone, as she was excited to meet the father she had never known. Anita, her mother, testified the victim was a slow learner and was in a special program at school, which required the victim to have an Individualized Education Plan. During the time Guitron lived with the victim and her family, he groomed the victim by telling her he loved her, he wanted to marry her, and he wanted to spend the rest of his life with her. The victim testified at one point Guitron gave her a diamond ring and told her he wanted to marry her. When the victim gave the ring back, Guitron swallowed the ring. Thereafter, Guitron left her a teddy bear with his ring around the bear's neck. The victim took the necklace from the bear's neck and began to wear his ring on a necklace. Ultimately, the 12-year-old victim fell in love with Guitron, a man in his mid-40s.

The State also presented evidence the victim was initially reluctant to have sex with Guitron for fear of getting pregnant. The victim testified Guitron began having sexual intercourse with her around November or December 2011, when she was 12 years old. She testified she did not initiate sex with Guitron. Instead, she testified to several specific instances where Guitron had pressured her into having sex with him, and at least one occasion where she voiced her concern to Guitron about becoming pregnant. The victim also told the jury they had engaged in sex more than ten times.

The State argued the victim was not capable of understanding her actions due to her age and immaturity, and thus she was incapable of giving consent. She did not know how to prevent pregnancy: she took One-A-Day vitamins because she believed they would prevent pregnancy and did not use condoms. A caseworker testified the victim did not know how to adequately care for a newborn, and the victim was initially more concerned about continuing her relationship with Guitron than about trying to understand her situation as a parent. These facts support the State's position that this victim was not prepared for pregnancy, did not understand how to prevent it, and did not understand the stigma associated with having her father's baby.

Therefore, the record reflects sufficient evidence supporting the verdict Guitron was guilty of sexual assault with a minor under the age of 14. The State presented sufficient evidence for a rational trier of fact to conclude the victim did not understand the consequences of her actions, she was incapable of giving her consent, and Guitron knew or should have known the victim was mentally or physically incapable of resisting his conduct when he engaged in sex with her. *See Jackson*, 443

U.S. at 319; *Shannon*, 105 Nev. at 790-91, 783 P.2d at 947 (citing NRS 200.366).

*Motions to admit evidence of a victim's prior sexual knowledge*

We next consider Guitron's argument the district court erred by denying his motion to admit evidence of the victim's prior knowledge of sexual conduct. Prior to trial, Guitron filed a motion in limine requesting the district court grant his motion to introduce evidence the 12-year-old victim had gleaned "vast sexual knowledge" from viewing Internet pornography with her friend from middle school. He argued this evidence was relevant to his defense the victim was actually the one who initiated sex with him because she was curious from viewing pornography and wanted to know what a penis felt like in her vagina. He also argued this evidence contradicted the State's theory this victim was slow or immature, as it showed she actually understood the consequences of her actions and consented to sexual intercourse with Guitron while he lay intoxicated on his couch.

"We review a district court's decision to admit or exclude evidence for an abuse of discretion." *Mclellan v. State*, 124 Nev. 263, 267, 182 P.3d 106, 109 (2008). A court's error will not be grounds for reversal where it does not affect the defendant's substantial rights, NRS 178.598, and even if the error is a constitutional violation, the guilty conviction may still stand if the error was harmless beyond a reasonable doubt. *Obermeyer v. State*, 97 Nev. 158, 162, 625 P.2d 95, 97 (1981). To be harmless beyond a reasonable doubt, an error of constitutional dimension cannot have contributed to the verdict. *See Valdez v. State*, 124 Nev. 1172, 1189, 196 P.3d 465, 476 (2008).

Nevada's rape shield law limits the degree to which a defendant may inquire into the victim's past sexual history. NRS 50.090;

COURT OF APPEALS
OF
NEVADA

(O) 1947B

10

*Summitt v. State*, 101 Nev. 159, 161, 697 P.2d 1374, 1375 (1985). But, due process affords defendants the right to present evidence in support of their arguments, *Vipperman v. State*, 96 Nev. 592, 596, 614 P.2d 532, 534 (1980), and the rape-shield law does not bar such evidence where its admission is necessary to protect the defendant's fundamental rights under the Sixth and Fourteenth Amendments, including where the evidence is used to show the victim's prior independent knowledge. *Summitt*, 101 Nev. at 162-64, 697 P.2d at 1376-77. Thus, where the defense uses such evidence *not to advance a theory of the victim's general lack of chastity*, but to show knowledge or motive, it may be admissible. *Id.* at 163-64, 697 P.2d at 1377.

In *Summitt*, the Nevada Supreme Court addressed this exception, holding a district court committed reversible error by denying a defendant's motion to admit evidence of the six-year-old victim's prior sexual knowledge. 101 Nev. at 160, 697 P.2d at 1375. The supreme court held the district court should admit evidence offered by the defendant that the victim had been sexually assaulted when she was four in order to dispel the inference—which the jury would otherwise likely draw—that a six-year-old victim would be incapable of describing a sexual assault unless it had actually occurred.[1] *Id.* at 162, 697 P.2d at 1376. The Nevada

---

[1]The supreme court in *Summitt* quoted favorably the New Hampshire Supreme Court in *State v. Howard*, 426 A.2d 457, 462 (N.H. 1981), wherein it stated:

> "We believe that the average juror would perceive the average twelve-year-old girl as a sexual innocent. Therefore, it is probable that jurors would believe that the sexual experience she describes must have occurred in connection

*continued on next page...*

Supreme Court approved New Hampshire's approach to determining whether to admit such evidence, adopting the rule that once the defendant seeks to admit evidence that may be precluded by the rape shield law, the district court must provide an opportunity whereby the defendant may show the evidence should be admitted because its probative value outweighs its prejudicial effect. *Id.* at 163, 697 P.2d at 1377. In making this determination,

> the trial court must undertake to balance the probative value of the evidence against its prejudicial effect, *see* NRS 48.035(1), and . . . the inquiry should particularly focus upon "potential prejudice to the truthfinding process itself," *i.e.*, "whether the introduction of the victim's past sexual conduct may confuse the issues, mislead the jury, or cause the jury to decide the case on an improper or emotional basis."

---

*...continued*

> with the incident being prosecuted; otherwise, she could not have described it. However, if statutory rape victims have had other sexual experiences, it would be possible for them to provide detailed, realistic testimony concerning an incident that may never have happened. To preclude a defendant from presenting such evidence to the jury, if it is otherwise admissible, would be obvious error. *Accordingly, a defendant must be afforded the opportunity to show, by specific incidents of sexual conduct, that the prosecutrix has the experience and ability to contrive a statutory rape charge against him.*"

*Summitt*, 101 Nev. at 164, 697 P.2d at 1377 (emphasis added) (quoting *Howard*, 426 A.2d at 462).

*Id.* (footnote omitted) (quoting *State v. Hudlow*, 659 P.2d 514, 521 (Wash. 1983)).

Here, the district court held a hearing prior to trial regarding the defendant's motion in limine. Guitron made an offer of proof the victim had obtained prior sexual knowledge by watching Internet pornography with one of her friends and her knowledge was relevant to rebut the State's theories the victim did not consent and Guitron knew the victim was mentally incapable of consenting to having sexual intercourse. Further, Guitron argued this evidence was relevant to support his statement to the police that this victim was curious about sex and had actually initiated sex with him. If admitted, Guitron argued, this evidence would be probative to his defense of statutory sexual seduction and would rebut the State's theory this case involved sexual assault. In response, the State presented almost no argument except to assert evidence that the victim's prior sexual knowledge was irrelevant because the victim had the defendant's baby and the pair clearly engaged in sex. The State never expressly addressed Guitron's defense.

The district court's subsequent ruling denying the defendant's motion was flawed under *Summitt*. The district court failed to explain its findings in light of the defense theory in this case and made no findings regarding the probative value of the evidence. Instead, the court summarily denied Guitron's motion, finding this evidence was too prejudicial.

As relevant here, statutory sexual seduction occurs when any sexual penetration or ordinary sexual intercourse transpires between a person older than 18 and a person younger than 16, where either of the

parties act "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of either of the persons." NRS 200.364(6)(b).

Here, Guitron was an adult over the age of 18 and the victim was under the age of 16. The victim had known Guitron for only a short time, not her entire life. The victim told the police, and later the jury, she and Guitron had fallen in love with one another.[2] Testimony suggested the victim was sexually curious and willing to engage in sex with Guitron.[3] Because the baby's DNA conclusively showed Guitron and the victim had sexual contact, the only issue for the jury to determine was whether this victim was incapable of understanding the consequences of her actions (the State's theory) or whether the victim consented to having sex with Guitron (the defendant's theory).

Significantly, Guitron did not seek to admit evidence that the victim had watched Internet pornography to muddy the victim's reputation or to attack her credibility; rather, he sought to bolster his defense through the statement he made to police that this victim had prior knowledge of sex, wanted to experience sex as a result of her curiosity, and consented to have sex with him. Thus, under the analysis set forth in *Summitt*, this evidence was relevant to his defense of statutory sexual seduction, and was more probative than prejudicial considering the facts of this case.

---

[2]Guitron gave the victim presents, including rings and teddy bears, and promised to marry her. She gave her baby Guitron's name.

[3]Anita told the police the victim said she wanted to know what a penis felt like inside of her.

Accordingly, the district court abused its discretion and erred by denying the defendant's motion to admit evidence of the victim's past sexual knowledge. Furthermore, the district court made inadequate findings regarding the admission of this evidence.

We take this opportunity to clarify the procedure for submitting and admitting or denying evidence of a victim's prior sexual knowledge. We hold that if a defendant in a criminal case makes a motion in limine pursuant to *Summitt* prior to trial, the defendant must make a detailed offer of proof as to what evidence the defendant seeks to admit at trial. The district court must conduct a hearing and the defendant must present justification for admission of the evidence, detailing how the evidence is relevant to the defense under the facts in the case. The district court must, thereafter, weigh the probative value of the proffered evidence against its prejudicial effect. In weighing the offer of proof, the district court must consider the prejudicial effect to the truthfinding process, as well as whether this evidence may confuse the issues, mislead the jury, or cause the jury to decide the case based on an improper or emotional basis. *See Summitt*, 101 Nev. at 163, 697 P.2d at 1377.

The district court must conduct this hearing on the record so as to provide the appellate court with a meaningful opportunity to review the district court's decision for abuse of discretion. We also hold, following this hearing, the district court must state on the record its findings of fact and conclusions of law, detailing what evidence shall be admissible and what evidence will not be admissible according to its ruling.

Despite the lack of findings by the district court in this case, we nevertheless affirm Guitron's conviction because the district court's error was harmless. Unlike the facts in *Summitt*, where a six-year-old

alleged sexual assault and no admitted facts provided an alternate basis for the child's knowledge of sexual conduct, the facts in this case are notably distinguishable. Specifically, although Guitron was precluded from presenting evidence regarding the victim's conduct of viewing Internet pornography, the district court allowed Guitron to present evidence and argue the victim was knowledgeable about sex prior to having sexual intercourse with Guitron.

Here, the 12-year-old victim admitted at trial she had knowledge about sexual conduct prior to having sex with Guitron. In fact, she explained to the jury she had conversations with her mother about sex, she knew about the birds and the bees, and she knew where babies came from. She even elaborated she told Guitron not to ejaculate inside of her vagina because she did not want to get pregnant. Anita confirmed this testimony and even told the jury the victim stated she was the one who initiated sex with Guitron.

During closing arguments, defense counsel analogized the victim to other teenage girls starring in the MTV reality show *16 and Pregnant*. Defense counsel argued the victim was knowledgeable about sex, understood the consequences of her actions, consented to and initiated sex, was in love with Guitron, and wanted to continue the romantic relationship. The defense urged the jury to disregard the State's theory that this crime was a sexual assault under conditions in which Guitron knew or should have known the victim was mentally or physically incapable of resisting his conduct. Finally, the district court specifically instructed the jury on statutory sexual seduction, and provided this charge as an alternative option for the jury's consideration on the verdict form. Therefore, the record overwhelmingly reflects Guitron was not precluded

from advancing the defense theory that Guitron committed the lesser offense of statutory sexual seduction as opposed to sexual assault of a minor.

Given the overwhelming evidence supporting the verdict in this case, and the fact that Guitron was not precluded from advancing his defense to the jury, we conclude the district court's error did not contribute to the jury's verdict and was therefore harmless. Accordingly, we will not overturn the jury's verdict despite the district court's error.

*The inverse elements instruction*

Guitron further claims the district court erred by rejecting his proposed inverse elements instruction as to the crime of sexual assault with a minor under the age of 14. He asserts under *Crawford v. State*, 121 Nev. 744, 753, 121 P.3d 582, 588 (2005), the district court was required to give the jury his inverse elements instruction. We agree.

"The district court has broad discretion to settle jury instructions, and this court reviews the district court's decision for an abuse of that discretion or judicial error." *Id.* at 748, 121 P.3d at 585. However, the district court may not refuse to give a proposed defense instruction simply because it is substantially covered by the other instructions given. *Id.* at 750-54, 121 P.3d at 586-89. In *Crawford*, the Nevada Supreme Court stated:

> [T]his court has consistently recognized that specific jury instructions that remind jurors that they may not convict the defendant if proof of a particular element is lacking should be given upon request. This court has also recognized that a positive instruction as to the elements of the crime does not justify refusing a properly worded negatively phrased position or theory instruction.

*Id.* at 753, 121 P.3d at 588 (footnote omitted) (internal quotations omitted).

Notwithstanding, if a proposed inverse or negatively phrased element instruction is misleading or would confuse the issues, the district court will not err by refusing to give it to the jury. *Carter v. State*, 121 Nev. 759, 765, 121 P.3d 592, 596 (2005). In *Carter*, the Nevada Supreme Court clarified a defendant is not entitled to instructions that are "misleading, inaccurate or duplicitous." *Id.* Even if a court errs by refusing to give an instruction, the error will be harmless if the reviewing court is "convinced beyond a reasonable doubt that the jury's verdict was not attributable to [that] error." *Crawford*, 121 Nev. at 756, 121 P.3d at 590.

> At trial, the court's elements instruction read:

> A person who subjects a minor under fourteen to sexual penetration, against the minor's will or under conditions in which the perpetrator knows or should know that the minor is mentally or physically incapable of resisting or understanding the nature of his/her conduct, is guilty of sexual assault with a minor under fourteen.

> Guitron proposed a negatively phrased elements instruction

that stated:

> If the State fails to prove beyond a reasonable doubt that any sexual penetration of a minor under fourteen was against the minor's will or under conditions in which the perpetrator knows or should know that the minor is mentally or physically incapable of resisting or understanding the nature of his/her conduct, then you must find the Defendant not guilty of the offense of Sexual Assault with a Minor Under Fourteen.

COURT OF APPEALS
OF
NEVADA

(O) 1947B

The district court rejected Guitron's proposed instruction after considering *Crawford*. It reasoned inverse instructions generally create confusion and lack clarity for jurors, as inverse instructions add unnecessary extra explanations.

Here, the record shows Guitron proposed a negatively phrased elements instruction pursuant to *Crawford*. Contrary to the district court's conclusion, the proposed inverse instruction was not misleading and would not have created confusion. Thus, the district court abused its discretion and erred when it denied the defendant's proposed inverse elements instruction.

Nevertheless, we conclude this error was harmless under the circumstances presented here. The jury was accurately instructed regarding the elements of sexual assault. As discussed above, substantial evidence supported the jury's verdict Guitron committed sexual assault with a minor under the age of 14. The State presented considerable evidence the 12-year-old victim was unable to understand the consequences of her actions or consent to having sexual relations with Guitron. The State's evidence showed Guitron groomed the victim and pressured her into having sexual relations against her will. Given the overwhelming evidence supporting the verdict, we are convinced beyond a reasonable doubt the verdict was not attributable to the court's refusal to give the inverse instruction. *See Crawford*, 121 Nev. at 756, 121 P.3d at 590. Accordingly, we do not reverse the verdict on this ground.

*Batson challenges*

Finally, Guitron contends that under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny, the State improperly used its peremptory challenges to remove non-white venire persons from the jury pool in

violation of Guitron's Fourteenth Amendment right to equal protection. We disagree.

The United States Supreme Court has consistently held "that prosecutorial discretion cannot be exercised on the basis of race, *Wayte v. United States*, 470 U.S. 598, 608 (1985), and that, where racial bias is likely to influence a jury, an inquiry *must* be made into such bias." *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (emphasis added) (citing *Ristaino v. Ross*, 424 U.S. 589, 596 (1976), and *Turner v. Murray*, 476 U.S. 28 (1986)); *Batson*, 476 U.S. at 95.

The three-pronged *Batson* test for determining whether illegal discrimination has occurred requires: (1) the opponent of the peremptory strike to show a prima facie case of discrimination, (2) the proponent of the strike to provide a race-neutral explanation, and (3) the district court to determine whether the proponent has "in fact demonstrated purposeful discrimination." *Diomampo v. State*, 124 Nev. 414, 422, 185 P.3d 1031, 1036 (2008) (citing *Batson*, 476 U.S. at 96-98). The reason for excluding a juror under the second prong need not be either persuasive or plausible so long as it does not deny equal protection. *Id.* At the third prong, the district court must determine whether the opponent of the strike has met his burden of demonstrating the proponent's explanation is a pretext for discrimination. *See Conner v. State*, 130 Nev. ___, ___, 327 P.3d 503, 508-09 (2014), *petition for cert. filed*, 83 U.S.L.W. 3767 (U.S. Mar. 18, 2015) (No. 14-1130). This burden is a heavy one. *See Hawkins v. State*, 127 Nev. ___, ___, 256 P.3d 965, 967 (2011) (discussing the Seventh Circuit's upholding of a preemptory strike despite the prosecution's "lame" race-neutral reason). The district court's factual findings regarding whether the proponent of a strike has acted with discriminatory intent is given

Court of Appeals
OF
Nevada

(O) 1947B

great deference, *Diamampo*, 124 Nev. at 422-23, 185 P.3d at 1036-37, and we will not reverse the district court's decision "unless clearly erroneous," *Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004).

Here, the record indicates Guitron initially objected to the State's preemptory strike of Prospective Juror 31, an Asian male, and the district court initially determined Guitron had failed to make a prima facia case as to that juror. After the State exercised a preemptory challenge to excuse Prospective Juror 52, an African-American female, Guitron renewed his objection, arguing the State had exercised more than half of its preemptory challenges on minorities. The district court did not specifically find Guitron had established a prima facie case; instead, the court turned to the State for the race-neutral explanations. Under these circumstances we conclude the district court mooted the first step of the *Batson* analysis. *See Ford v. State*, 122 Nev. 398, 403, 132 P.3d 574, 577 (2006). *Cf. Watson v. State*, 130 Nev. ___, ___, 335 P.3d 157, 169 (2014) (discussing situations where the first *Batson* step is not mooted). It therefore fell to the State to provide a race-neutral explanation. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

The State indicated it had struck Juror 31 because he was a single father who automatically believes children.[4] As to Juror 52, the State indicated it was currently prosecuting Juror 52 for a sex offense. The State further noted Juror 52 claimed she was molested when she was young and her daughters were also molested, but she did not think it appropriate to move forward with charges. Further, Juror 52 appeared

---

[4]The record reflects that Juror 31 automatically believes children merely because they are children, and he articulated no reason for his tendency to believe children.

more upset over being the victim of identity theft than over being molested. Following these explanations, Guitron acknowledged he had the burden to demonstrate these reasons were a pretext for discrimination. *See Conner*, 130 Nev. at ___, 327 P.3d at 508-09. To meet this burden, Guitron argued the State's failure to strike similarly situated jurors evinced pretext. The district court found the State's reasons to be race-neutral and rejected the *Batson* challenge.

The State's reasons were clear, reasonably specific, facially legitimate, and did not communicate any inherent discriminatory intent. *See id.* at ___, 327 P.3d at 508. The record reflects key differences between Jurors 31 and 52 and the jurors who were not struck by the State.[5] As Guitron was required to sufficiently demonstrate it was more likely than not the State acted with racially discriminatory intent or purpose, *id.* at ___, 327 P.3d at 509; *Kaczmarek*, 120 Nev. at 334, 91 P.3d at 30, Guitron failed to meet his burden and these differences undermine Guitron's argument and support the district court's finding. Under these facts, the district court did not err in denying the *Batson* challenges.

*CONCLUSION*

Guitron's convictions of incest and sexual assault with a minor under the age of 14 are supported by substantial evidence. To the extent the district court erred in failing to allow evidence of the victim's prior sexual knowledge and failing to give Guitron's inverse elements

---

[5]Guitron argued Proposed Jurors 24 and 47 were similarly situated to Proposed Jurors 52 and 31. Juror 24, however, was not being prosecuted for a crime, and Juror 47 stated she would consider all of the evidence and try to be fair in weighing a child's testimony. We further note Guitron used a preemptory challenge to strike Proposed Juror 47 from the jury.

Court of Appeals
of
Nevada ·

(O) 1947B

instruction, those errors were harmless and do not warrant reversal. Finally, Guitron failed to show the district court erred by denying his *Batson* challenges. Accordingly, we affirm the jury's verdict.

_____, J.
Silver

We concur:

_____, C.J.
Gibbons

_____, J.
Tao